EDMUND G. BROWN JR.
Attorney General of the State of California
DANE R. GILLETTE
Chief Assistant Attorney General
GERALD A. ENGLER
Senior Assistant Attorney General
PEGGY S. RUFFRA
Supervising Deputy Attorney General
JOAN KILLEEN
Deputy Attorney General
State Bar No. 111679
    455 Golden Gate Avenue, Suite 11000
    San Francisco, CA 94102-3664
    Telephone: (415) 703-5968
    Fax: (415) 703-1234
    Email: Joan.Killeen@doj.ca.gov
Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **DAVID MONTIEL CRUZ,** | C 07-4329 JSW (PR) |
| Petitioner, | |
| v. | |
| **RICHARD SUBIO, Warden,** | |
| Respondent. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS**

1   EDMUND G. BROWN JR.
  Attorney General of the State of California
2   DANE R. GILLETTE
  Chief Assistant Attorney General
3   GERALD A. ENGLER
  Senior Assistant Attorney General
4   PEGGY S. RUFFRA
  Supervising Deputy Attorney General
5   JOAN KILLEEN
  Deputy Attorney General
6   State Bar No. 111679
    455 Golden Gate Avenue, Suite 11000
7     San Francisco, CA 94102-3664
    Telephone: (415) 703-5968
8     Fax: (415) 703-1234
    Email: Joan.Killeen@doj.ca.gov
9   Attorneys for Respondent

10           IN THE UNITED STATES DISTRICT COURT

11         FOR THE NORTHERN DISTRICT OF CALIFORNIA

12              SAN FRANCISCO DIVISION

| | |
|---|---|
| **DAVID MONTIEL CRUZ,** | C 07-4329 JSW (PR) |
| Petitioner, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS** |
| **v.** | |
| **RICHARD SUBIO, Warden,** | |
| Respondent. | |

19       In its Order to Show Cause, this Court identified petitioner's claims for relief as follows:

20 "1) the trial court's jury instructions on competency violated Petitioner's constitutional rights; 2) the

21 court erred in admitting Petitioner's statement, which was involuntary and violated Petitioner's

22 rights under *Miranda v. Arizona*; 3) prosecutorial misconduct; 4) the trial court's instructions on

23 proving absence of duress violated Petitioner's rights; 5) the trial court's instructions on the defense

24 of idiocy violated Petitioner's rights; 6) cumulative error; 7) the trial court's instructions on insanity

25 violated Petitioner's rights; 8) the court's application of a sentencing enhancement for aggravated

26 kidnapping violated Petitioner's rights; and 9) the trial court's imposition of a 25-years-to-life

27 enhancement violated Petitioner's equal protection rights."  1/8/08 Order to Show Cause at 2.  As

1  shown below, the state court reasonably rejected petitioner's claims.

2  **STATEMENT OF THE CASE**

3        On October 31, 2003, the Santa Clara County District Attorney charged petitioner with

4  burglary, Cal. Penal Code §§ 459-460(a), lewd and lascivious acts on a child during the commission

5  of burglary and kidnapping, Cal. Penal Code §§ 288(b)(1), 667.61(a)-(e), kidnapping a child under

6  14 years, Cal. Penal Code §§ 207(a), 208(b), assault by means of force likely to produce great bodily

7  injury and with use of a deadly weapon, Cal. Penal Code §§ 245(a)(1), 12022(b)(1), inflicting pain

8  or suffering on a child with use of a deadly weapon, Cal. Penal Code §§ 273a(a), 12022(b)(1), and

9  sexual penetration by force during the commission of kidnapping and with personal use of a deadly

10 weapon, Cal. Penal Code §§ 289(a)(1), 667.61(a), (b), (d), (e), 12022.3(a).  Exh. A [hereafter

11 "CT"]132-141.[1/]

12        On November 19, 2003, petitioner pleaded not guilty and not guilty by reason of insanity.

13 CT 156.  On September 14, 2004, a jury found petitioner guilty as charged and found the special

14 allegations to be true.  CT 524-548.  On September 21, 2004, the jury found petitioner sane on all

15 counts.  CT 600-604.  On January 21, 2005, the trial court sentenced petitioner to 90 years to life

16 consecutive to 12 years four months.  CT 676-679; Exh. C [hereafter "RT"] 2313-2319.

17        On April 13, 2007, the California Court of Appeal affirmed petitioner's judgment.  Exh.

18 G.  On May 10, 2007, the court of appeal denied rehearing.  Exh. I.  On July 25, 2007, the California

19 Supreme Court denied review.  Exh. K.

20        Petitioner filed his federal petition for writ of habeas corpus on August 22, 2007.  The

21 petition is timely.  28 U.S.C. § 2244(d)(1); *Bowen v. Roe*, 188 F.3d 1157, 1158-59 (9th Cir. 1999).

22

23

24

25

26  ────────────────────────

27        1. A competency trial was held from September 29, 2003, until October 16, 2003, resulting
    in a jury's finding that petitioner was competent to stand trial. Aug. CT 158; Exh. B [hereafter
28  "ART"] 726-727.

1

### STATEMENT OF FACTS[2/]

2

**Competency Trial**

3

**Defense Case**

4    A few years before trial, petitioner worked at a deli.  His English was limited, but  his

5    supervisor did not notice anything unusual about him.  ART 79-88, 92-93, 96, 98, 104.

6    In June 2003, Correctional Officer Schulz, who did not speak Spanish, told Sergeant

7    Powers that petitioner did not communicate well.  Schulz had not observed petitioner exhibit bizarre

8    behavior or look confused or bewildered at the time of trial.  ART 131-133, 135-141, 143.

9    Petitioner's mother and siblings testified that petitioner's father frequently beat him as a

10    child.  Sometimes petitioner complained of pain in his chest and head.  ART 161-163, 169-170, 209-

11    210, 222-224.  He told his mother he heard voices and a person passing by when he slept; he

12    sometimes woke up screaming.  His nightmares persisted into his teenage years.  ART 167, 175-176,

13    219-220, 224.  Petitioner attended school through second or third grade and then worked in his

14    father's fields.  He later moved to the United States, leaving a wife and two children behind.  ART

15    168-171, 188.

16    Petitioner helped defense investigator Valente Santana prepare a videotape for his family

17    in Mexico; he understood the purpose of the tape and was able to follow Santana's instructions

18    without difficulty.  ART 196-197, 463-466.[3/]

19    Defense psychiatrist Jose Silva met with petitioner, reviewed records, and interviewed

20    family members.  ART 237-239, 253-254.  He opined  petitioner was suffering from a psychotic

21    disorder, cognitive disorder, panic attack disorder, and post traumatic stress disorder (PTSD).  He

22    did not think petitioner was malingering.  Petitioner functioned at the level of a person with mild

23

24    2.  There were three trials:  competency, guilt, and sanity.  Petitioner burglarized a home in

25    San Jose, assaulted Rosa and her son Pablo, and kidnapped and sexually assaulted Rosa's daughter
Jeanette.  Petitioner held Jeanette captive in his home for 53 hours before releasing her in East Palo

26    Alto.  He acknowledged some of the crimes and claimed he was insane and acting under duress.

27    3.  The prosecution later played petitioner's videotaped statement.  ART 656-658.  A

28    translation of the statement is contained in the Augmented Clerk's Transcript, pages 86-97.

1  mental retardation.  ART 244, 252, 263-264, 302-303.  His ability to get into the United States,

2  obtain identification, find unskilled jobs, buy a car, and live independently was consistent with a

3  diagnosis of mild mental retardation.  ART 312-314, 322-323.

4      Dr. Silva believed petitioner heard voices at the time of the crimes because he told Rosa

5  "they" sent him to get her.  ART 316-318.  He acknowledged that in six hours of interviews

6  petitioner never told the police he heard voices.  Petitioner only heard voices intermittently.  ART

7  407-408, 444.  Dr. Silva opined petitioner was able to understand the nature and purpose of the

8  proceedings, but was not competent to assist his attorney in a rational manner.  ART 381-382, 399.

9  He admitted petitioner had been planning for two days to go to the victim's home, because he

10  wanted to return to Mexico and thought he would be able to steal enough money to take with him,

11  and that petitioner's actions showed thinking and planning.  ART 423-424, 431.  Dr. Silva agreed

12  that petitioner "had a capacity to be manipulative."  ART 434.

13      **Prosecution's Case**

14      Petitioner's employer at the deli had not observed any unusual behavior and thought

15  petitioner was a typical employee.  When applying for work, petitioner submitted identification,

16  resident alien, and social security cards in the name of David Sanchez Lopez.  He handled traffic

17  citations without difficulty.  ART 471-473, 476, 507-518, 522-523.

18      Petitioner was arrested while hiding in his attic.  ART 598.  Detective Juan Gonzalez

19  interviewed him in Spanish without difficulty and observed no unusual behavior.  Petitioner

20  understood  general background questions and responded appropriately.  As to the underlying

21  crimes, petitioner explained he needed money.  He told Gonzalez about his preparation for and

22  execution of the crimes, describing in detail how he sexually assaulted Jeanette, bound her, confined

23  her in a box, and placed it in his car.  Petitioner also described assaulting Rosa and Pablo.  He

24  admitted keeping Jeanette hostage.  When he saw news coverage of the crimes, he felt the police

25  were closing in on him, so he released her.  He denied his girlfriend was involved in the crimes.

26  ART 601-618, 626-627.

27      During the interviews, petitioner did not say he was hearing voices or hallucinating, nor

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4329
JSW (PR)

did he exhibit bizarre behavior.  ART 617.  Gonzalez had "no doubt" petitioner understood his situation.  ART 618.  After admitting he committed serious crimes, petitioner asked Gonzalez when he thought he would get out of jail.  Gonzalez said such questions were "very common. [¶] . . . It happens all the time."  ART 619.  Petitioner was concerned about his potential sentence.  ART 625-626.

Correctional Officer White, who saw petitioner regularly, had not observed any unusual behavior.  When petitioner learned there was an article about him in the paper, he asked to see it. He asked White to check his jail account and was pleased to learn he had money for purchases. ART 485-494, 498-503.  White said, "He speaks English fine."  ART 499-500.

Court-appointed psychologist Robert Perez interviewed petitioner in Spanish on three occasions and administered several psychological tests, one of which specifically addressed competency.  He also reviewed numerous documents and reports related to the case, and interviewed some witnesses.  ART 533-536, 549-552.

Dr. Perez concluded petitioner "very clearly was capable of understanding the nature of the proceedings against him."  ART 536.  Petitioner told Dr. Perez what he had done in a clear and consistent manner.  He understood why he was in jail and the roles of his attorney and the prosecutor.  ART 536-537.  As to whether petitioner understood his own status in relation to the proceedings, Dr. Perez said, "He absolutely understood that he was charged with a crime; that if convicted, he could be punished.  He was not clear on the severity of punishment [to] which he could be subject, but he clearly understood that he was subject to punishment."  ART 537. Petitioner also told his family in the defense videotape that his case was very serious. ART 569-571. On the third prong of the competency test, Dr. Perez said, "There was just no question that he was able to assist his attorney rationally.  There's a number of bases for that statement."  Dr. Perez did not consider the issue of petitioner's competency a close question.  "It's a very clear case.  He is clearly competent to stand trial.  I have no question about that fact."  ART 538.  The question was a "no brainer.  He's competent."  ART 583.  Petitioner understood his situation and could talk about it rationally, including information potentially relevant to a defense  ART 540.

1    Petitioner had provided the information necessary for an evaluation of a plea of not guilty

2    by reason of insanity.  Dr. Perez thought petitioner might be mentally ill based on the voices he said

3    he heard, although it was rare to identify a voice from a specific person, but he was not incompetent.

4    ART 540-541, 543.  Petitioner was able to talk about the facts of the case and what he was thinking

5    before, during, and after the crimes.  When he spoke to a police officer, he answered the questions

6    in a rational manner.  ART 542, 544.

7    On cross-examination, Dr. Perez said it was possible petitioner was mildly mentally

8    retarded, but he thought petitioner's ability to care for himself and obtain employment after coming

9    from Mexico made it more likely than not that he functioned above the level of mild mental

10   retardation.  ART 576-581.  He did not think petitioner's belief that the victim remained with him

11   voluntarily for two or three days meant he did not understand the proceedings.  The issue was

12   whether he understood and could talk about his mental status at the time of the crimes, not whether

13   he was rational when he committed them.  Petitioner understood the gravity of his situation.  ART

14   592-593.

15   **Guilt Trial**

16   **Prosecution's Case**

17   In June 2003, 15-year-old Pablo lived on Southwind Drive in San Jose with his mother

18   Rosa, stepfather Jose, and nine-year-old sister Jeanette.  On the afternoon of Friday, June 6, Pablo

19   arrived home with his mother.  When Rosa activated the garage door, it only opened two or three

20   feet.  After Pablo unsuccessfully tried to open the door, he crawled under it.  RT 334-340, 390, 431-

21   433.

22   Once inside the garage, Pablo saw a strange car facing toward the driveway.  His sister

23   was in the back seat, screaming at Pablo to watch out for the man in the garage.  A man, whom

24   Pablo identified as petitioner, approached and started punching him in the face.  When Pablo fell,

25   petitioner kicked him in the stomach.  As Pablo tried to crawl under the car, petitioner pulled him

26   out.  He put his hands on Pablo's head and chin and pushed in opposite directions, as if to break his

27   neck.  Pablo begged for his life.  Petitioner stopped, picked Pablo up, and forced him into the house.

28

1   He said he wanted Pablo's mother; he also wanted money. When Pablo asked if Jose sent him,

2   petitioner said he would not give names. RT 340-348, 363, 376, 379, 386-387, 404.[4/]

3        As Pablo and petitioner entered the kitchen, Rosa came in the front door. She asked

4   petitioner where her daughter was and how he got into the house. Petitioner said he was there

5   because of her and that he could not give names. He let go of Pablo and started hitting Rosa in the

6   face. As they fought, she scratched his face and bit his finger. When she tried to grab the phone,

7   petitioner ripped it from the wall, then started hitting Pablo again. During the struggle, Pablo could

8   hear Jeanette screaming that she was in the garage. As Rosa tried to reach the garage door,

9   petitioner grabbed her and renewed his attack, punching and kicking her in the face and head as she

10   lay on the floor. Pablo tried to hit petitioner with a chair and small ladder, but he threw them aside.

11   When Pablo tried to hit him with a frying pan, petitioner took it to beat Rosa in the head. RT 346-

12   356, 435-442, 471, 482-485, 488-489.

13        When Rosa stopped screaming and moving, Pablo thought she was dead. He ran to a

14   neighbor's home to seek help, while petitioner drove off with Jeanette. About 4:30 p.m., Officer

15   Varela responded to the scene. Rosa was bleeding from her forehead. Pablo's left eye and lip were

16   swollen and he had blood coming from his nose and mouth. Rosa later received 23 stitches to her

17   head. RT 311-315, 325, 356-357, 443-446.

18        Jeanette testified that when she arrived home from school that day she thought her mother

19   would be there. She entered the partially opened sliding glass door and called to her mother, but

20   received no response. She saw her bedroom window was broken, her jewelry box was tipped over,

21   and another small box was missing. RT 502-506, 568.

22        As Jeanette tried to call her mother's cell phone, petitioner appeared at the door and asked

23   if Roberto was there. Jeanette said no. She was about to lock the door when petitioner pushed it

24

25       4. Rosa and Jose had some violent arguments during their 10-year marriage. Once Jose held
an object, possibly a gun, to Rosa's head. There were times when Jose hit Rosa and the police

26   responded. Around the time of the kidnapping, Rosa and Jose were going through a separation, but
they reconciled afterward. RT 370-373, 394-396, 401-402, 463-465. Jose kept a safe that contained

27   seven or eight hundred dollars, some jewelry, and his important papers. Rosa did not have a key to
the safe nor did she know its combination. RT 414-415, 417, 465, 467, 490-491.

28

1  open, put Jeanette over his shoulder, and walked toward her brother's bedroom. Jeanette fought

2  back as petitioner put her on Pablo's bed, pulled down her pants and underwear, and got on top of

3  her. As she continued to yell for help, she could feel something hard and painful in her vagina. RT

4  507-511, 580-581. Jeanette redressed after petitioner got up. When she asked what he was doing

5  there, petitioner said he came from Mexico. He handcuffed her, told her to wait in the bedroom, left

6  briefly, then returned and picked her up again. He took her into the garage where he cut some string

7  and tied it around her legs, then put her into a large box, which he placed in the back of his car. RT

8  512-516.

9  As petitioner went to open the garage door, Pablo came inside. Jeanette yelled at Pablo

10  to get out, but petitioner attacked, punching, kicking, and choking him. Petitioner picked Pablo up

11  by the neck and took him into the kitchen. Before the door closed, Jeanette could see her mother,

12  then heard yelling and the sounds of a fight. She kept calling to her mother that she was in the

13  garage as she tried to untie her feet. RT 517-520.

14  After the fight, petitioner drove off with Jeanette in the back seat. When she asked if he

15  killed her mother, he replied, "I'm not sure." RT 521. Jeanette could see her brother run out of the

16  garage as they drove off. She yelled for help, but petitioner told her to shut up. When she persisted,

17  he poked her in the forehead, lip, and chest with a screwdriver, causing her to bleed. Jeanette was

18  afraid and pretended she was dead. RT 521-523.

19  Petitioner drove to a house and parked inside the garage. He took Jeanette upstairs to a

20  locked room where there was a bed, couch, television, and bathroom. He put her on the bed, duct-

21  taped her mouth, and turned on the television. Jeanette could see her mother's car on the television

22  news program, but nothing else. When she tried to talk, petitioner removed the duct tape. At some

23  point he untied her legs. RT 524-528, 533. Petitioner asked if she wanted to see her mother for the

24  last time, and she said yes. When she asked how long he was going to keep her, he said, "two or

25  three years," causing her to cry. RT 529. Jeanette asked if she could take a shower. Petitioner

26  agreed, but handcuffed her to the shower stall. After she dressed, petitioner put her back on the bed

27  with the handcuffs behind her back. RT 530-531.

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4329
JSW (PR)

8

1    Jeanette fell asleep; when she awoke, she could see the sunset.  After a second shower,

2  petitioner put her on the bed, removed her clothing, and got on top of her.  Jeanette was crying

3  during the assault; she could feel something hard being pushed into her vagina while petitioner

4  moved on top of her.  When it was over, she fell asleep again.  RT 531-535.

5    When Jeanette awoke, her face was bleeding and "white gooey stuff" was coming out of

6  her vagina.  RT 536.  Petitioner was watching the news, and Jeanette saw her cousin.  RT 536-637.

7  When a man appeared on the news, petitioner asked who he was.  Jeanette said he was a friend of

8  her father's; petitioner replied, "I'm going to kill him."  RT 537.

9    Jeanette asked for a glass of water.  When petitioner left the room she opened the window

10  and yelled for help to a man outside, but she could not tell if he heard her.  Petitioner returned to the

11  room and angrily pushed her down on the bed.  That afternoon, he sexually assaulted her again.  RT

12  537-539.  She was "screaming and yelling," so petitioner got a knife from a drawer.  RT 538.  He

13  held it to her neck and said, "If you cooperate, this will be the last time."  RT 539.

14    When Jeanette told petitioner she was hungry, he gave her his cell phone and told her to

15  call Little Caesar's, a pizza place.  She wanted to call 911, but could not because petitioner was

16  sitting next to her.  When she ordered the pizza, she thought she gave her name.  She gave

17  petitioner's address and phone number, which he provided, and tried to remember them afterward.

18  RT 540-543.

19    At some point Jeanette told petitioner she did not want to die.  He grabbed a pillow and

20  pushed it down on her face, forcing her to turn her head so she could breathe.  He said he was going

21  to kill her and held the pillow on her face for about ten seconds while she kicked and struggled, then

22  took it off.  RT 557-559, 604.  He said he was sorry for taking her and did not know what he was

23  doing.  RT 585-586.

24    The next morning Jeanette managed to remove the handcuffs.  RT 544-545.  She asked

25  petitioner if he was going to let her go.  He said, "I don't know."  RT 545.  She was crying and said

26  she missed her mother.  That afternoon, petitioner anally raped her.  At some point during the

27  weekend he touched her vagina, but not during that assault.  RT 545-548.

28

1   Once Jeanette heard petitioner talking on his cell phone; she heard the name Frankie, and

2   petitioner say, "I don't have her." RT 560.  Jeanette tried to think of ways to escape, and knew her

3   kidnapping was still on the news. RT 559-561.  Once petitioner started laughing; he said he was

4   going to escape and they would never find him. RT 588-589, 603.  Another time he told Jeanette

5   that when he was younger he wanted to have a child. RT 588-589.  Sometimes he was nice to her

6   and other times he was mean.  RT 591.

7   At some point they heard someone in the house.  Petitioner told Jeanette to hide in the

8   bathroom.  When it was dark, they went to the car.  Petitioner drove for awhile, eventually stopping

9   at a liquor store.  He told Jeanette that if she said anything he would kill her and that he was going

10  to Mexico.  He watched until she went into the liquor store, then drove off.  RT 561-567.  Before

11  he left, Jeanette asked for some money, hoping to get his fingerprints.  She had taken a broken watch

12  and some clay from his room as evidence.  RT 571-572.

13  Jeanette talked to the store's owner, who called the police.  They arrived about 10:45 p.m.

14  that Sunday night.  Jeanette described the house where she had been held, then directed them to it.[5]

15  The house, at 70 Dearwell, was four or five blocks from her home.  RT 567-574, 673-674, 679-680,

16  962-963.  Jeanette was "petrified" at the time.  RT 675.

17  Using a K-9 unit, officers apprehended petitioner in the attic of his house in the early

18  morning of June 9. RT 675, 705, 712-717, 720.  He sustained bite marks from his violent resistance

19  to arrest.  RT 724-725, 731-732.  Jose's safe was in petitioner's bedroom.  RT 636-641, 810-811.

20  One of petitioner's fingerprints was inside a closet in Pablo's bedroom; another was on

21  a piece of duct tape.  RT 659-662, 664-665.  His hair was in a beanie on the stove of Rosa's home.

22  His semen was on bed sheets at Jeanette's  and his houses, and on Jeanette's underpants.  RT 844,

23  865-870, 873-874.  Jeanette's DNA was on one of the sheets.  The blood on the panties could have

24  been hers.  Her vaginal and anal swabs revealed blood, but not semen.  Her DNA was on petitioner's

25  

26  5. Jeanette often played with twins Daniella and Alejandra, who were students at her school.
    Their mother and petitioner dropped them off at her house, but Jeanette did not go to their house.
27  RT 581-583.  While being held captive, Jeanette realized she was in the girls' home because she saw
    their photographs.  RT 583-585.
28

1   penile and scrotal swabs.  RT 866-867, 870-875.

2          During her sexual assault examination, Jeanette was very fearful and asked if petitioner

3   could get her.  She reported pain in her vaginal and anal areas and when she urinated.  Her upper lip

4   was cut, bruised, and swollen.  She had a round puncture mark on her lower lip and a scratch on her

5   chin from a sharp object, possibly a screwdriver.  Her vaginal area was abraded and extremely red,

6   as was the area extending down to her anus, and there were fresh tears in her hymen.  RT 757-758,

7   762-764, 768-773, 783, 785.  The hymenal opening was "very large" because there was so little

8   hymen left to see.  RT 774.  The findings were "consistent with severe, acute, penetrating force."

9   RT 775.  No other explanation accounted for Jeanette's vaginal injuries; the findings also were

10  consistent with anal penetration.  Even several hours after the examination, Jeanette's vaginal area

11  was so swollen she could not urinate.  RT 774-777, 780.  Jeanette had suffered one of the "worst

12  cases" the examining nurse had seen.  RT 772.

13         Officer Juan Gonzalez interviewed petitioner, who identified himself as Enrique Alvarez,

14  on three occasions over a three-day period, each time in Spanish.  Petitioner had lived with his

15  girlfriend Sylvia and her children for about a year, and had worked in the area.  RT 880-885, 928.

16         In the first interview, petitioner admitted he had done "things that [he] should not have

17  done."  RT 886.  He knew Jeanette's house and thought her family was rich.  He planned to rob them

18  because his relationship with Sylvia had ended and he needed money to return to Mexico.  He hoped

19  to scare Jeanette's mother into giving him money.  RT 886-888, 897-898, 953-954.  He went to

20  Jeanette's house, asked for a fictional person, forced his way into the house, and sexually assaulted

21  her.  He took her to the garage, bound her hands and feet, put her in a box, and put the box in his car.

22  RT 890-893.  He was about to leave when Pablo appeared.  He hit Pablo multiple times, then took

23  him inside, where he encountered Jeanette's mother.  They attacked him with various objects, but

24  petitioner used a frying pan to beat Rosa.  He drove off before they could call the police.  As he left,

25  he stabbed Jeanette with a screwdriver to make her stop screaming.  RT 893-896.

26         Petitioner took Jeanette to his house, where he saw a television news report about the

27  kidnapping, which made him nervous.  He admitted sexually assaulting Jeanette that weekend and

28

1   claimed she did not resist.  He decided to get rid of her because of the media coverage and so

2   dropped her off in East Palo Alto, hoping to distance himself from her.  RT 896-904.

3       In his second interview, petitioner admitted trying to smother Jeanette; he decided to stop

4   because he did not know how to get rid of her body.  He felt trapped by the media coverage.  Before

5   he dropped Jeanette off in East Palo Alto, he told her to tell the police he was on his way to Mexico

6   in a black car, and to say it was someone other than petitioner who abducted her.  Afterward, he

7   threw the handcuffs away.  RT 905-907, 910, 918-920.

8       Petitioner admitted he first took the safe from the house.  He decided to assault Jeanette

9   when he went back; initially he thought she could open the safe for him.  He wanted to intimidate

10  her family by saying he had a key to the house and was there for Rosa.  RT 907-908, 910-911, 945.

11  That weekend, Sylvia called and accused him of abducting Jeanette, which he denied.  He did not

12  blame her or anyone else for his crimes.  RT 908-909, 932-933.  He told the police no one else was

13  involved.  RT 911-912, 922, 929.  When shown a surveillance videotape from Jeanette's neighbor's

14  house, petitioner said he did not know the driver of the car that briefly stopped next to him.  RT 937-

15  940; see RT 678-679.

16      In his third interview, petitioner said he was hiding in the attic because he was afraid and

17  knew the police were looking for him.  During his interviews and conversations at the hospital,

18  petitioner never said he heard voices or saw visions, nor did he appear to be mentally ill.  RT 912-

19  914.

20      Detective Heather Randol's June 9, 2003, interview of Jeanette was played for the jury.

21  RT 966, 978-979.

22  **Defense Case**

23      Petitioner presented testimony that Rosa and Jose had been involved in two prior domestic

24  violence incidents.  RT 984-998.

25      Pablo told Officer Mitchell that his mother called petitioner an idiot in Spanish.  He said

26  petitioner was wearing a shirt with an emblem similar to one Jose wore for a tree cutting service.

27  RT 1000-1002.  Pablo told Sergeant Reyes that when he was three or four years old, Jose threatened

28

1    his mother with a gun.  He also said Jose was angry because Rosa did not tell him she was selling

2    a house, and that she had planned to give Jose $10,000 but changed her mind.  Pablo said the

3    intruder did not respond to all of his questions, which made him think he might be on drugs.  RT

4    1068-1072.

5        Rosa's friend Sylvia Nichols thought Jose was very quiet and seemed uncaring during the

6    weekend Jeanette was missing.  She did not recall telling the police that Rosa said Jose wanted to

7    kick her out of the house.  In May or June, Rosa told her she was in the process of separating or

8    getting a divorce.  RT 1141-1144, 1404-1407, 1488, 1524-1525.

9        Rosa told Sergeant Hober she recently decided not to give Jose $10,000 she had promised

10   him.  On June 5, she closed escrow on a house she owned.  Jose did not know she was getting the

11   proceeds on June 10.  She was two months behind on the monthly rent she paid him.  Rosa said Jose

12   and Pablo had disagreements and that Jose was very critical of Pablo.  RT 1146-1148, 1151, 1155-

13   1156.

14       Sylvia Gutierrez met petitioner when he rented a room from her.  They were in a

15   relationship for about 18 months.  She never saw petitioner act inappropriately with her five

16   children.  She dropped her twins off to play at Jeanette's house on numerous occasions.  Petitioner

17   never said he knew Jeanette's stepfather.  RT 1004-1006, 1009-1011, 1016-1019.  On June 1,

18   petitioner locked Gutierrez in her room overnight.  The next day she left and moved in with her

19   sister.  She was upset because of that incident, as well as previous occasions when he hurt her.

20   Petitioner's behavior and treatment of Gutierrez had become worse.  He did not have a job and had

21   not worked for a year, though he helped with grocery shopping, laundry, and other errands.  RT

22   1007-1008, 1011-1012, 1017-1020, 1023-1024, 1043-1044, 1084-1085.  He never told her he heard

23   voices or had hallucinations.  She never saw him talking to himself or appear to be hearing voices.

24   RT 1017.

25       Gutierrez heard about Jeanette's kidnapping on the news.  She did not go back to her

26   house that weekend.  At some point she talked to petitioner and told him she did not want to go back

27   because of what he had done to her.  RT 1013-1015, 1018.  Petitioner called her sister and told her

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4329
JSW (PR)

to tell Gutierrez that she "could run but [she] cannot hide, because he had some friends that were going to come after [her]."  RT 1015; see RT 1086, 1089-1090.

Christina Ayala, Gutierrez's older daughter, sometimes heard Gutierrez and petitioner arguing.  Ayala did not like petitioner because he failed to provide for Gutierrez.  RT 1039-1041. She referred to him as her mother's "weirdo boyfriend" because he stared at them when they walked around the house, but spoke very little.  RT 1040.  Ayala was not home the weekend Jeanette was kidnapped.  She returned about 10:00 p.m. Sunday night to an empty house.  She did not recall telling an investigator that she passed petitioner on the stairs.  RT 1041-1044.

Petitioner's friend Frank Casto said petitioner never told him he heard voices or was hallucinating, nor did he talk to himself.  Petitioner wanted to get money to return home.  During the weekend Jeanette was missing, petitioner called Casto several times.  When Casto saw the suspect's sketch on the news, he thought it looked like petitioner.  RT 1091-1099.

Petitioner's siblings testified their father beat petitioner severely from the time he was a young child.  RT 1116-1121, 1307-1313, 1329-1331, 1338-1339.  Petitioner talked to himself and sometimes appeared to talk to other people; he had nightmares and woke up screaming.  RT 1119-1121, 1311, 1316, 1333, 1337-1338, 1344.[6]  He went to the United States in search of a better life. RT 1123-1124, 1323-1324, 1343.

Petitioner testified his father's beatings gave him nightmares.  RT 1349-1350, 1353-1355. Sometimes he talked out loud to "other people" who were not there.  RT 1355-1356.  He married and had two children.  He came to the United States in 2000 and worked as a day laborer and in a deli.  He rented a room from Gutierrez and later became her boyfriend.  He blamed her for losing his job at the deli because she expected him to look after her children.  He denied hitting her, but admitted he locked her in her room because she accused him of sleeping with Ayala.  RT 1358-1368.

Petitioner frequently drove Gutierrez's twin girls to Jeanette's house to play.  He said he knew Jose, with whom he had worked.  A few days before the kidnapping, Jose asked petitioner to

---

6. Petitioner's sister never saw petitioner talk to himself or to imaginary people.  RT 1324-1325.

beat up Rosa, take his safe, and kidnap Jeanette.  He said he would leave a key.  Petitioner did not want to comply, but Jose threatened to shoot him and displayed a gun.  He said if petitioner did as he asked, he would give him $1,000.  RT 1368-1372, 1376-1381.

Petitioner drove to Jeanette's house, parked on the street, and found the key.  He had the handcuffs Jose had given him to use on Jeanette.  He went inside, took the safe, and put it in his car, then went back to the house to wait for Rosa so he could beat her up.[7]  When Jeanette came home, he took her into the bedroom and took off her clothes, but denied he had sex with her.  RT 1381-1388.  Afterward, he tied her up, put her in a box, and put the box in the back seat of his car.  RT 1390-1392, 1414-1415.  When petitioner saw Pablo, he hit him.  He hit Rosa because he was being attacked.  He recalled leaving the house, but not how he did so.  RT 1388-1389, 1394-1396, 1400.

Petitioner denied hitting Jeanette with a screwdriver and claimed he was surprised to find her in the car.  He removed the bindings on her feet and took her upstairs to his bedroom.  Jeanette asked to take a shower; she removed the handcuffs herself, which petitioner said were plastic.  He denied he had sex with her that day, and said she was free to leave the room.  He expected to hear from Jose the next day.  RT 1414-1418, 1420-1421, 1425.

Petitioner said he had sex with Jeanette twice that weekend, but claimed she requested it the second time.  He thought he treated her well; she watched movies and was happy.  When he put a pillow on her face, he was playing.  He let her order a pizza and gave her free access to his phone.  RT 1423-1430, 1432.

Petitioner claimed Jeanette planned her departure.  He drove a short distance on the highway, but did not know where he was going.  He thought he was in trouble and asked Jeanette not to tell anyone he took her.  After returning home, petitioner hid in the attic because he was afraid.  He was later awakened by voices and a barking dog.  The dog bit him, and an officer kicked him.  He did not remember anything else until he woke up in the hospital.  He did not recall what

---

7.  Petitioner later said he waited in his car for Rosa and Jeanette to come home.  Another car stopped beside his; the driver told him Jose was checking on him, then drove off.  RT 1396-1400.

1   he told the police about the kidnapping. He did not tell them about Jose because Jose threatened to

2   kill him. He claimed he did not know he was in jail, and asked the officers if he could go home.

3   RT 1432-1437, 1440-1449.

4        On cross-examination, petitioner said Jose wanted him to kidnap Jeanette and beat up

5   Rosa because he was having marital problems. RT 1459. Jose "forced" him to commit the crimes.

6   RT 1462, 1469. Petitioner denied thinking Jose and Rosa were rich. He claimed it was Jose's idea

7   to have sex with Jeanette. She was lying when she said petitioner raped her four times, but he

8   admitted forcing her to have sex at his house. RT 1453, 1455, 1463, 1465. He knew it was wrong,

9   but he "was not very well" at the time. RT 1467-1468. He denied that he covered her mouth to

10  prevent her from screaming or locked her in his room. He did not keep pictures of partially clad

11  young girls in his cell. RT 1456-1457, 1462, 1468.

12       Jose testified he learned Jeanette had been kidnapped when he returned home from work

13  that day. He had not accused Rosa of cheating on him. She did not owe him money and he did not

14  tell her he was kicking her out of the house. He did not know petitioner, had not worked with him,

15  and had never seen him at his house or given him a key. He did not know that Jeanette was going

16  to be kidnapped and had nothing to do with her disappearance. RT 1700-1702, 1705-1709.

17       A videotape of petitioner's first police interview was played for the jury. RT 1128, 1130,

18  1136, 1156-1157. Jeanette's neighbor's surveillance tape was also played for the jury. RT 1493-

19  1498.[8] The surveillance tape showed a car passing petitioner's car, reversing, stopping by his car

20  for about five seconds, then driving off. From the time petitioner was shown placing something in

21  his trunk to the time he fled with Jeanette was about one and a half hours. RT 1495, 1511-1512.

22       Defense investigator Valente Santana met with petitioner, who initially identified himself

23  as Enrique Sosa Alvarez, about 20 times. RT 1478, 1516. Petitioner did not mention that anyone

24  threatened him until January 26, 2004. A few days later, he said Jose threatened him. RT 1479,

25  _____

26       8. Jeanette's neighbor said he was threatened by a man and a woman the day after the
    kidnapping. RT 1640-1641. They told him "it was messed up what [he] did, and that [he] should
27  have minded [his] own business," and said he was "going to get fucked up." RT 1640. He did not
    take the threat seriously; there were police and media still in the area. RT 1641.

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4329
JSW (PR)

1482-1484.  Santana denied raising the possibility that someone else was involved, but admitted

telling petitioner it was important he know all the facts, including anyone else's involvement.  RT

1517-1518.  Petitioner did not tie the car in the surveillance tape to Jose.  RT 1478-1479, 1482-1484,

1518.

Psychiatrist Jose Silva met with petitioner numerous times and administered various tests.

He also interviewed petitioner's family members and reviewed numerous documents and records.

RT 1530-1537.  Dr. Silva diagnosed petitioner as suffering from mild mental retardation, a psychotic

disorder not otherwise specified, post traumatic stress disorder (PTSD), a dissociative disorder not

otherwise specified, panic attack disorder without agoraphobia, paraphilia not otherwise specified

with features of pedophilia and coercive sexuality disorders, somatization disorder, a personality

disorder not otherwise specified, and a culturation problem.  Petitioner also had brain damage and

cognitive deficits beyond those associated with mental retardation.  RT 1037-1038, 1541, 1555-

1556, 1559-1560.  Although petitioner had "coercive pedophile behaviors, raping behaviors . . .

[and] fantasies," Dr. Silva did not diagnose him with pedophilia because there was "too much

psychopathology" that explained why he experienced the pedophilic tendencies.  RT 1587.

Petitioner experienced "command hallucinations" "telling him to rape, rape people around the

neighborhood, little kids, older woman [sic], many people."  RT 1572-1573.  He also experienced

command hallucinations to hit, cut up, and kill someone.  He was on anti-psychotic medication and

an anti-depressant for a few months in jail.  RT 1563-1564, 1580-1581, 1613.  Petitioner's

symptoms may have increased because of problems with his girlfriend, "likely some drug use," and

the experience of being threatened by Jose.  RT 1573.[9]  It was "highly likely" petitioner would be

involved in violent behavior.  RT 1574-1575.

Dr. Silva knew jail medical personnel thought petitioner was faking or exaggerating his

illness, and that other experts disagreed with his diagnosis.  Upon arrest, petitioner did not tell the

---

9. Petitioner told a probation officer he had used cocaine, marijuana, methamphetamine, and alcohol.  At the time of the kidnapping he regularly drank beer to the point of complete intoxication. He last used cocaine and marijuana about a week before his arrest.  CT 658.

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4329 JSW (PR)

police or jail personnel he was hearing voices.  Petitioner had the capacity to be manipulative, had lied about his personal information, and had changed his story about the kidnapping several times. RT 1598-1600, 1606-1616.  Petitioner told Dr. Silva he did not hear any voices while waiting outside Jeanette's house or when he raped her.  Dr. Silva thought money partially motivated petitioner to commit the crimes.  RT 1618-1619.  Petitioner also fantasized about raping little girls "for a long time."  RT 1622.

Neuropsychologist Patricia Perez-Arce found petitioner had an IQ of 58 and said he functioned at the level of a five to seven-year-old child.  She did not think he was faking.  She diagnosed him with mental retardation, PTSD, a dissociative disorder that affected his memory, and possible brain damage.  RT 1651-1654, 1660-1663, 1669-1670.  She agreed if a person was in a psychotic state, he would not be able to make or carry out a plan effectively or carry on a coherent conversation.  Someone with mild mental retardation could distinguish between right and wrong. RT 1675-1676, 1680.

**Prosecution's Rebuttal**

An officer found newspaper clippings of partially clad young girls in petitioner's cell.  RT 1712-1713.[10]

Petitioner's sister said he planned his trip to the United States two months in advance; he wanted to earn money to buy a house in Mexico.  RT 1717-1718, 1721-1722, 1725.  He applied for work in the name of David Sanchez Lopez, and had resident alien and social security cards in that name.  RT 1727-1730.

Petitioner's cell phone records showed no calls to or from Jose or Rosa between June 2002 and June 10, 2003.  The investigation of Jose as a potential suspect included showing petitioner's photograph to Jose's employer and coworkers.  RT 1733-1737, 1740.

Petitioner made sandwiches for over a year at Fred Zanotto's deli.  Zanotto never saw him exhibit bizarre behavior, talk to himself, listen to voices, or appear for work in an inappropriate manner.  Most of petitioner's difficulties involved not knowing English.  Zanotto saw no similarity

---

10.  Petitioner denied the pictures were his, claiming they were already there.  RT 1852.

1   between petitioner and the developmentally disabled employees he hired to clean up and carry out

2   groceries. RT 1753-1761.

3         Court-appointed psychologist Ubaldo Sanchez met with petitioner on November 26, 2003,

4   and reviewed police reports and other records. RT 1769-1770. Dr. Sanchez thought petitioner "was

5   totally malingering. He, when he first came into the room, I asked him, are you David Cruz, and

6   he said yes. And then after I explained to him why I was there, to do an evaluation for the court, he

7   then stated that he didn't know who he was. He didn't know his name." RT 1770. When Dr.

8   Sanchez asked petitioner general background questions, petitioner "didn't know where he was from.

9   He didn't know if he had parents. He didn't know if he had brothers or sisters. He didn't know he

10  was married, didn't know he had children, didn't know he was in a relationship." RT 1771.

11  Petitioner was "very quick to respond" to questions about how he was feeling, however. RT 1772.

12  He said he "felt depressed and sad and that spirits bothered him." RT 1771. Petitioner "possibly

13  grew up believing in spirits and demons as part of his culture." RT 1775. Dr. Sanchez thought

14  petitioner could tell the difference between right and wrong; he said spirits told him to do bad things,

15  which he did not want to do. RT 1775. Petitioner's malingering was "obvious." RT 1774. He was

16  also "very inconsistent" in speaking English to jail staff. RT 1778.

17        Petitioner claimed he did not recall anything about the crimes and did not know who

18  Jeanette was. His responses affirmed Dr. Sanchez's belief he was faking in light of his detailed

19  statements to the police. RT 1776-1777. Dr. Sanchez had extensive experience working with the

20  mentally retarded. He did not think petitioner was retarded or that his IQ test was valid. When he

21  asked simple questions, petitioner claimed not to know what a day or a month was, what money was

22  used for, or why people wore watches. Moreover, individuals with limited education often scored

23  low on IQ tests. RT 1779-1782. Planning and executing a crime, as shown in this case, was

24  consistent with knowing right from wrong and inconsistent with being in a psychotic state. When

25  petitioner told Dr. Silva he did not have a full erection and penetrated Jeanette only an inch in the

26  first rape, it appeared he was trying to come up with a defense or minimize his crimes. RT 1783-

27  1792.

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4329
JSW (PR)

1    Psychologist Mark Bruguera worked at the jail's in-patient psychiatric unit. Petitioner was

2    sent there upon his arrest and on two other occasions for a total of 10 days. Dr. Bruguera diagnosed

3    petitioner with adjustment disorder, possibly caused by severe stress, such as his confinement. RT

4    1812-1813, 1820-1824. When petitioner was arrested, he denied experiencing symptoms of a

5    mental disorder. In December 2003, he became uncooperative and gave contradictory responses.

6    He claimed not to know or understand even the most basic concepts, which was extremely unusual.

7    Dr. Bruguera thought he was feigning confusion and had poor judgment. Several other mental

8    health professionals made similar observations. RT 1824-1826. Petitioner was prescribed

9    medication on his third admission to the unit, but only to help him sleep. He was later given an anti-

10   depressant and a low dose anti-psychotic medication, to help calm agitation, for three or four

11   months. RT 1826-1829. "Situational depression" was "usually a reaction to the stress of jail." RT

12   1827. Petitioner's behavior at the time of the crimes was not consistent with being in an acute

13   psychotic state. Also, aggressive behavior was rare in individuals with PTSD. RT 1830-1832, 1840.

14   Dr. Bruguera thought it unlikely petitioner had really experienced auditory hallucinations based on

15   his history and reporting. He had never heard a psychotic individual say voices told him to rape a

16   little girl. RT 1845, 1850.

17   **Sanity Phase**

18   Dr. Silva thought petitioner could function at the level necessary to kidnap Jeanette, but

19   his behavior during the crimes indicated he was being coerced by both internal and external factors.

20   RT 2028, 2030, 2034-2036. Petitioner understood he was in trouble and was remorseful, but it did

21   not mean he understood the difference between right and wrong or the nature and quality of his acts.

22   RT 2036-2039.

23   Dr. Silva thought petitioner was insane at the time he committed the offenses, but he knew

24   other experts disagreed with him. RT 2040-2042, 2047-2049. He thought about 90 percent of the

25   prison population suffered from some type of mental illness, but agreed not all of them were legally

26   insane. RT 2044-2045. He admitted petitioner told him, "I wanted to take her clothes off. She

27   didn't want me to take them off. She screamed. And I took off her pants." RT 2055. Petitioner was

28

1    hoping to avoid capture.  RT 2055.

2          Dr. Perez-Arce thought petitioner could understand right and wrong at the level of a

3    seven-year-old.  Although he engaged in planning behavior in carrying out the crimes, he still

4    functioned at that level.  RT 2064, 2076-2078.  She thought petitioner had a "poor hold on reality"

5    and could not distinguish reality from his delusions.  RT 2067-2068.  He thus could not understand

6    the nature and quality of his acts.  RT 2068.  Dr. Perez-Arce thought petitioner was insane when he

7    committed the crimes.  He had learned from early childhood that the voices he heard were evil or

8    wrong; he had not carried out their directions until the time of the crimes.  RT 2079, 2082.  He "lost

9    control of his behavior" when he was under stress or felt that people were threatening him.  RT

10   2072.  Dr. Perez-Arce agreed petitioner knew what he was doing when he had sex with Jeanette, but

11   a lot of young children knew about sex.  RT 2083-2084.  She said he "had been hearing voices for

12   weeks at a time, telling him that he had to rape young women and girls.  It was an obsessive thought

13   that was in his mind constantly.  And he was no longer surrounded by any support system that would

14   prevent him from following those voices."  RT 2086.

15         Court-appointed psychologist Jeffrey Kline testified for the prosecution.  He conducted

16   a sanity evaluation, reviewing numerous records and interviewing and testing petitioner.  He

17   concluded petitioner was sane when he committed the crimes.  RT 2102-2106.  He thought petitioner

18   "had some mental problems," but that he understood the nature and quality of his acts and that what

19   he was doing was wrong.  RT 2106; see RT 2117-2119.  "[T]he overwhelming weight of the

20   evidence went towards sanity."  RT 2120.  Petitioner's actions throughout the weekend showed he

21   understood what he was doing and had motivations that did not reflect psychotic thinking.  He

22   engaged in organized behavior that suggested a cognitive awareness of what was going on, that he

23   knew what he was doing was wrong, and that he did not want to be detected.  RT 2106-2111, 2114.

24         During Dr. Kline's interview, petitioner acted as though he did not understand what was

25   going on and grossly exaggerated his symptoms.  RT 2111-2112.  For example, he claimed he did

26   not know his name, age, where he was, where he was from, or where he was arrested.  He even

27   counted six fingers on his hand.  RT 2112.  To legitimately give such answers, petitioner would have

28

1  to be extremely psychotic or profoundly brain-damaged, which was not the case.  RT 2112-2113.

2         Officer White never saw petitioner talk to himself, act like he was hearing voices, or

3  exhibit bizarre behavior.  He watched television, talked to her, and was able to communicate his

4  needs and requests in English, RT 2136-2138, 2140-2141, all of which petitioner denied.  RT 2146-

5  2147.  Inmates "always ask" when they are getting out of jail.  RT 2138.

6                          **STANDARD FOR GRANTING RELIEF**

7         The Court reviews the state court's rulings under a "highly deferential" standard imposed

8  by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  *Woodford v. Visciotti*, 537

9  U.S. 19, 24 (2002) (per curiam).  The federal court has no authority to grant habeas relief unless the

10  state court's ruling was "contrary to, or involved an unreasonable application of," clearly established

11  Supreme Court precedent.  28 U.S.C. § 2254(d)(1).  A decision constitutes an "unreasonable

12  application" of Supreme Court law if the state court's application of law to the facts is "objectively

13  unreasonable."  *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  A state court's ruling based on a

14  factual determination also must be "'objectively unreasonable' in light of the record" to warrant

15  habeas relief.  *Miller-El v. Cockrell*, 537 U.S. 322, 348 (2003); 28 U.S.C. § 2254(d)(2).  The

16  petitioner bears the burden of showing that the state court's decision was unreasonable.  *Visciotti*,

17  537 U.S. at 25.  Even if a constitutional error occurred, habeas relief is available only if the error had

18  a "substantial and injurious effect or influence in determining the jury's verdict."  *Fry v. Pliler*, ___

19  U.S. ___, 127 S.Ct. 2321, 2325, 2328 (2007), internal quotation marks omitted; *see Brecht v.*

20  *Abrahamson*, 507 U.S. 619, 637 (1993).

21                                  **ARGUMENT**

22                                       **I.**

23  **THE TRIAL COURT'S ERROR IN DEFINING COMPETENCY AND**
    **RESPONDING TO THE JURY'S QUESTION DURING THE**
24  **COMPETENCY TRIAL WAS HARMLESS**

25         Petitioner contends the trial court erroneously instructed the jury on the elements required

26  to find a defendant competent to stand trial because the court omitted the words "in a rational

27  manner" from the third element and compounded the error when it responded to a jury question

28

1  regarding the competency instruction. The state court of appeal found the trial court erred, but found

2  the error harmless beyond a reasonable doubt.

3  **A.    State Court Of Appeal's Ruling**

4      At the suggestion of the prosecutor, and over defense counsel's objection, the trial
   court omitted the words "in a rational manner" from the phrase "able to assist his
5  attorney" in the court's instruction to the jury explaining the standard for competency to
   stand trial. The court relied on *People v. Conrad* (1982) 132 Cal.App.3d 361. Thus, at the
6  conclusion of the case, the trial court instructed the jury as follows: "Members of the
   Jury: [¶] In this proceeding you must decide whether the defendant is mentally competent
7  to be tried for a criminal offense. This is not a criminal proceeding, and the innocence or
   guilt of the defendant of the criminal charge pending against him is not involved, nor is
8  the question of his legal insanity at the time of the commission of the offense involved.
   [¶] Although on some subjects his mind may be deranged or unsound, a person charged
9  with a criminal offense is deemed mentally competent to be tried for the crime charged
   against him, if: [¶] 1. He is capable of understanding the nature and purpose of the
10 proceedings against him; [¶] 2. He comprehends his own status and condition in reference
   to the proceedings; and [¶] 3. *He is able to assist his attorney in conducting his defense.*
11 [¶] The defendant is presumed to be mentally competent. The effect of this presumption
   is to place upon the defendant the burden of proving by a preponderance of the evidence
12 that he is mentally incompetent as a result of a mental disorder or developmental
   disability." (Italics added.)

13

14     As the People all but concede, *Conrad* does not support the trial court's conclusion
   that the phrase "in a rational manner" only applies to defendants who represent
15 themselves. Section 1367 provides in relevant part: "A defendant is mentally
   incompetent for purposes of this chapter if, as a result of mental disorder or developmental
16 disability, the defendant is unable to understand the nature of the criminal proceedings or
   to assist counsel in the conduct of a defense *in a rational manner.*" (Italics added.) Our
17 Supreme Court has consistently described incompetence to stand trial in the statutory
   language, as the inability "to understand the nature of the criminal proceedings or to assist
18 counsel in the conduct of a defense *in a rational manner.*" (*People v. Dunkle* (2005) 36
   Cal.4th 861, 885, italics added; see also *People v. Lawley* (2002) 27 Cal.4th 102, 131;
19 *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1110; *People v. Davis* (1995) 10 Cal.4th 463,
   527.) This definition comports with due process. (*People v. Jablonski* (2006) 37 Cal.4th
20 774, 808.) We conclude it was error to omit the phrase "in a rational manner" from the
   instruction.

21     The court missed an opportunity to correct the error when, in response to the jury's
   request during deliberations for "more elaboration from the Court on points two and three
22 of the definition of mental competence," the court stated simply: "If we start getting any
   more detailed, then the Court would begin taking apart the various bits of testimony that
23 were presented, which would be almost impossible to do in a neutral way. [¶] What I
   would suggest, that when you come back tomorrow, reread the instruction—and I don't
24 know what number it is—or all the instructions. And then go back over in your minds the
   testimony from the various witnesses that have been presented. And if you want any of
25 the testimony ... reread, we will be more than happy to give it to you."

26     However, a juror other than the foreperson then added: "We're here to see if he's
   competent ... or to see if he's incompetent, but there's no degrees to this incompetency.
27 It's either competent or incompetent. [¶] ... [¶] Correct?" The court replied, "Correct. [¶]
   ... [¶] [E]ither a person is competent to stand trial or not competent to stand trial. And you

28

have the definition of what is necessary ... for a person to be competent to stand trial." The foreperson then offered: "I understood the request to be more towards the elaboration of the law. For example, to what degree must the defendant be able to assist his attorney? To what degree must he be able to understand the proceedings?" The court replied, "He's going to have to be able to understand the proceedings sufficiently so he can assist his attorney. Now, that doesn't help you at all.... [¶] And, you know, whether or not you want to go about looking at the three things that are necessary separately, together, two, combination, that's up to you. But my recollection of the evidence is that there should be enough testimony to help you with the definition, along with reading the jury instruction."

Section 1138 provides, in relevant part, that "[a]fter the jury have retired for deliberation, ... if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given...." The jury's request for clarification triggered a duty on the trial court's part "to help the jury understand the legal principles it is asked to apply. [Citation.] This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] Indeed, comments diverging from the standard are often risky." (*People v.. Beardslee* (1991) 53 Cal.3d 68, 97.)

Here, the standard instruction was not "full and complete." While the jury's questions seemed more geared toward wanting to know if a competency finding required a person to be further along than less far along on "sliding scale" of competency, the jury may well have found it helpful to know that a competent defendant is one who can assist his attorney in a rational manner. Here, the court acknowledged that its answer would not help the jury "at all." "[A] court must do more than figuratively throw up its hands and tell the jury it cannot help." (*People v. Beardslee, supra,* 53 Cal.3d at p. 97.) Even if the court could have done more to assist the jury, this type of error does not require reversal unless the defendant can establish prejudice. (*Beardslee,* at p. 97; *People v. Solis* (2001) 90 Cal.App.4th 1002, 1015.)

Our Supreme Court has not resolved whether the prejudice from instructional error in the definition of the competency standard is to be measured under *People v. Watson* (1956) 46 Cal.2d 818, 836, or *Chapman v. California* (1967) 386 U.S. 18. (*People v. Huggins* (2006) 38 Cal.4th 175, 193.) Assuming for the sake of argument that there is a reasonable likelihood the jury misunderstood the applicable law (*id.* at p. 192) and that the *Chapman* test applies, in our view, the error was harmless beyond a reasonable doubt.

The question put to the experts was whether defendant was "competent to assist his attorney in a rational manner." It is true that, in the opinion of Dr. Silva, the defense psychiatrist, defendant was not competent to assist his attorney in a rational manner because of his delusion that his girlfriend was responsible for the crimes insofar as her "voice" told him to have sex with his female neighbors and with children. Dr. Silva also testified that defendant believed that his view of his lack of culpability was morally, ethically and legally correct, and that if his attorney were to do the right thing, he would accept his version of events and defend him on that basis, but that he also believed that his attorney would not listen to him and was going to do what he wanted to do.

Unlike the jury, Dr. Silva never saw the videotape defendant made at the request of the defense investigator, in which he entreated his family and wife in Mexico to cooperate with the investigator. In the videotape, defendant told his family that he was in jail on a serious case facing various charges; that the investigator was in Mexico working to help him in the case; and that they could help him with his case by helping the investigator find

his brothers and sisters and telling the investigator about his reasons for coming to the U.S. to find a better life, his lack of a place to live in Mexico, the bad treatment he received and how it affected him.

Dr. Silva's opinion was undermined by this striking testament to defendant's ability to rationally assist his attorney, his delusions and cognitive deficits notwithstanding. It was also undermined by the testimony of Dr. Perez, the prosecution's clinical psychologist, who agreed that defendant had a psychotic disorder and was emotionally impaired, had some cognitive impairments and was not malingering, but was capable of rationally assisting his attorney to present a mental defense to the charges because he did not deny he was mentally ill, could communicate his delusions to his attorney, and talk with his attorney about his mental processes at the time of the commission of the crimes. The record here established overwhelmingly that despite defendant's various psychiatric, cognitive and emotional problems, "defendant had the ability to consult with his counsel with a reasonable degree of rational understanding, and had a rational and factual understanding of the proceedings." (*People v. Huggins, supra,* 38 Cal.4th at p. 194.)

*Huggins* establishes that a reviewing court may also look to the later guilt trial to determine whether instructional error at the competency trial was prejudicial. (*People v. Huggins, supra,* 38 Cal.4th at pp. 193-194.) Our review of the record of the guilt trial only reinforces our conclusion that the court's instructional error in failing to modify the phrase "able to assist his attorney" with the words "in a rational manner" was, on these facts, harmless beyond a reasonable doubt. Here, as in *Huggins,* evidence was presented to show that defendant acted normally before, during and after the crimes, and in the jail. (*Id.* at p. 193.) In addition, at the outset of the guilt trial defense counsel stated that he was satisfied defendant, "at this point in time, does have a basic understanding of the function of the jury trial process, the role of the judge, the prosecutor, the attorney, the jurors." Defense counsel further declared his intent to continue to monitor defendant's understanding of the proceedings "as the trial progresses." Counsel did not declare a doubt as to defendant's competency during trial, or disagree with the court's later observation "that there's nothing in the court's point of view that would indicate to the court that [defendant's] competence is at issue at this point in time." Finally, defendant testified lucidly in his own behalf at trial, discussed his upbringing, gave a detailed account of the crimes and claimed he committed them because of Jose's threats. Here, as in *Huggins,* the error was harmless beyond a reasonable doubt.

Exh. G at 16-21, original italics.

## B.   The State Court's Rejection Of Petitioner's Claim Was Reasonable

A criminal defendant may not be tried unless he is competent. *Pate v. Robinson*, 383 U.S. 375, 378 (1966). "[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). "Requiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel." *Godinez v. Moran*, 509 U.S. 389, 402 (1993).

1    Here, petitioner does not contend that the state standard for competency failed to meet

2  these constitutional mandates.  Rather, he contends the trial court erred by omitting the words "in

3  a rational manner" from the third element of the instruction, and that it further failed to clarify the

4  manner in which the defendant must be able to assist counsel when it responded to the jury's

5  questions.

6    If the court finds the instructions were erroneous, it must then determine whether the error

7  was harmless.  *Calderon v. Coleman*, 525 U.S. 141, 145-147 (1998) (per curiam).  On federal habeas

8  review, the court must determine whether the error had a substantial and injurious effect or influence

9  in determining the jury's verdict.  *Id.* at 145-46, citing *Brecht v. Abrahamson*, 507 U.S. at 637; *see*

10  *Fry v. Pliler*, 127 S.Ct. at 2328.

11    Here, the state court of appeal found that the trial court misinstructed the jury by omitting

12  the words "in a rational manner" from the third element of the competency instruction.  It assumed

13  "for the sake of argument" that there was "a reasonable likelihood the jury misunderstood the

14  applicable law."  Exh. G at 19-20.  However, it found beyond a reasonable doubt that the error was

15  harmless.

16    This Court should likewise find the error harmless under *Brecht v. Abrahamson*, 507 U.S.

17  at 637.  As the state court pointed out, the experts at the competency trial all addressed the question

18  whether petitioner was competent to assist counsel "in a rational manner."  Petitioner assisted in the

19  preparation of a videotape for his investigator to use in Mexico.  In the videotape, petitioner told his

20  family members that he was in jail facing serious charges, and that the investigator was working to

21  help him on the case.  He asked his family to cooperate with the investigator and explained that they

22  could help his case by telling the investigator about his background, including the poor treatment

23  he had received from his father and how it had affected him.  The court concluded the defense

24  expert's opinion that petitioner was incompetent "was undermined by this striking testament to

25  defendant's ability to rationally assist his attorney, his delusions and cognitive deficits

26  notwithstanding."  Exh. G at 20.  The defense expert's conclusions were also undermined by his

27  concessions, such as that petitioner could be manipulative, that petitioner had been planning for two

28

days to go to the victim's home to steal money so that he could return to Mexico, and that in six hours of police interviews, petitioner never said he heard voices.  The prosecution expert concluded that petitioner was capable of rationally assisting his counsel despite his psychological difficulties and cognitive impairments, in part because he did not deny he was mentally ill, he could communicate his delusions to his counsel, and he could talk about his mental processes at the time of the crimes.

Moreover, as the state court also found, the court and parties agreed that petitioner was competent throughout his subsequent guilt trial.  At the outset of the trial, defense counsel specifically stated he was not raising a doubt as to petitioner's competency. RT 271-273.  Later, the trial court noted that petitioner's competency was being monitored throughout the trial.  RT 1103. Defense counsel did not dispute the trial court's statement that nothing indicated petitioner's competence was at issue.  RT 1104.  The prosecutor thought petitioner's demeanor and behavior reflected that he was competent.  RT 1104-1105.  Most tellingly, petitioner testified in his own behalf and gave a detailed account of the crimes in a lucid and articulate manner.  *See Benson v. Terhune*, 304 F.3d 874, 885-86 (9th Cir. 2002) (testifying in one's own defense is "the quintessential act of participating in one's own trial," and a defendant's "lengthy, logical and cogent trial testimony reflects a sufficient ability to understand the proceedings and to assist in [his] own defense").  Petitioner did not blame any voices or other mental infirmities; rather, he blamed Jose, whom he claimed forced him into committing the crimes.  In any event, a defendant may be competent even where he is mentally retarded, *Atkins v. Virginia*, 536 U.S. 304, 318 (2003), has a diagnosed mental disorder, *United States v. Leggett*, 162 F.3d 237, 244 (3d Cir. 1998), or has cognitive impairment from brain damage.  *United States v. Timbana*, 222 F.3d 688, 701 (9th Cir. 2000).

In light of the record of petitioner's competency trial and subsequent guilt trial, any error in the trial court's instructions defining the elements of competency could not have had a substantial and injurious effect or influence in determining the jury's verdict.  *Brecht v. Abrahamson*, 507 U.S. at 637.

## II.

### THE STATE COURT REASONABLY REJECTED PETITIONER'S CLAIM THAT HIS STATEMENTS TO THE POLICE WERE TAKEN IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS

Petitioner contends that he did not voluntarily waive his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and that his subsequent admissions were coerced. The state court reasonably rejected his claims.

### A.    State Court Record

The defense challenged the admissibility of statements petitioner made to the police following his arrest. The prosecution filed a written opposition, which included the first portion of each of the interviews. CT 265-290. A hearing on the motion was held on July 27, 2004. RT 82-185.

Officer Juan Gonzalez testified that he interviewed petitioner three times. The first interview was at 2:00 p.m. on June 9, 2003, and lasted about two hours. It was video and audio taped. Petitioner had been arrested earlier that morning and had received medical treatment for dog bites. He had been given a sandwich and a drink before the interview. RT 85-87. Petitioner was "wide awake" and "responsive to [their] questioning." He "appeared a little bit somber, otherwise he was alert." RT 87. Gonzalez removed petitioner's handcuffs and read him his *Miranda* rights at the beginning of the interview. RT 87-88; *see* CT 276-278. Petitioner "acknowledged understanding" his rights. RT 88. He understood his right to remain silent. RT 91. He "clearly understood" that whatever he said could be used against him. RT 92. After Gonzalez clarified petitioner's right to an attorney, "it was very clear he understood." RT 93. Petitioner also understood that an attorney would be provided if he could not afford one. RT 93-94. Gonzalez told petitioner that he wanted to speak with him and asked if that was okay. RT 94; *see* CT 278. Petitioner had not made a verbal response to Gonzalez's last statement, but Gonzalez believed he "clearly understood." RT 95. Gonzalez proceeded to question him, beginning with biographical questions. RT 95; *see* CT 278. During the course of the interview, petitioner indicated when he did not understand something. His confusion primarily focused on his ignorance of the legal process

1  since he had not been arrested before.  RT 95-96, 131-132, 138.  Gonzalez had encountered similar

2  confusion with other suspects.  RT 117.  The interview was conducted entirely in Spanish.  RT 96.

3  The officers did not make any threats or promises to petitioner.  RT 99.  Gonzalez did not believe

4  petitioner suffered from any type of mental deficiency.  RT 97-98.

5        The second interview, also conducted in Spanish, was at 2:45 p.m. on June 10, 2003, and

6  lasted about an hour and a half.  RT 99-100.  Petitioner was "alert" and "somber."  RT 100.

7  Petitioner was again advised of his *Miranda* rights, which he acknowledged understanding.  RT 100-

8  103; *see* CT 281.  Gonzalez testified that petitioner "clearly understood his rights," but he was

9  confused about the next steps in the legal proceedings because he had never been arrested before.

10  RT 104; *see* CT 282-283.  The second interview was "very similar" to the first one.  RT 105-106.

11        The third interview, also conducted in Spanish, was at 9:00 a.m. on June 11, 2003, and

12  lasted 45 minutes to an hour.  RT 106-107, 133.  Gonzalez advised petitioner of his rights at the

13  beginning of the interview.  RT 108-110; *see* CT 287.  As in the other interviews, petitioner

14  indicated when he did not understand something.  RT 110.  The interview was similar to the first two

15  interviews.  Petitioner's intellectual functioning was the same.  RT 107-108, 111.

16        Gonzalez said that one of the officers had asked petitioner if he went to church, and told

17  him he could help himself and ask forgiveness from God.  RT 120-123.  Gonzalez said those

18  questions were part of the initial, background portion of the interview.  They had not questioned him

19  about the crime at that point.  The topic of forgiveness may also have arisen later in the interview.

20  RT 139, 141.  The officer also said they could not help petitioner until he told them what happened.

21  RT 122.  Gonzalez testified, "During the whole interview [petitioner] continually indicated people

22  didn't understand him.  Sylvia didn't understand him.  References the police didn't understand him,

23  very much feeling like a victim."  RT 126.  Petitioner agreed in the interview that the police had not

24  promised him anything.  RT 136.  Gonzalez was sure that petitioner did not feel threatened or

25  intimidated by him.  RT 137.  When he spoke to petitioner at the hospital, they did not discuss the

26  case at all.  Gonzalez helped translate for the medical personnel and intermittently talked with

27  petitioner about general topics.  RT 113-115.

28

1    Dr. Silva testified that petitioner was mildly mentally retarded and suffered from a

2  psychotic disorder not otherwise specified, panic attack disorder, and PTSD. RT 145. He reviewed

3  the *Miranda* advisements with petitioner and said that petitioner consistently stated he did not

4  understand the advisements. RT 155-156. He acknowledged that petitioner consistently said he did

5  understand the advisements when he was interviewed by the police. RT 156. Petitioner indicated

6  to Dr. Silva that he did not understand what a right was and did not understand how his statements

7  would be used against him. RT 157-158. Petitioner understood what an attorney was and that he

8  would help him. RT 158. He did not appear to understand the concept that he could have an

9  attorney at no cost. RT 158-159. In light of petitioner's intellectual deficits and mental illness, Dr.

10  Silva believed his statements to the police that he understood his rights should not be taken at face

11  value. RT 159-160.

12    Dr. Silva thought petitioner did not "understand many basic words due to his mental

13  illness." RT 167. He acknowledged that petitioner previously had been stopped driving a stolen car,

14  read his *Miranda* rights, waived them, and given a statement explaining why he was in the car. RT

15  170-172. Dr. Silva also acknowledged that when petitioner did not understand something, he said

16  so. RT 172. He admitted that petitioner might have reported symptoms that did not exist. RT 173.

17  He also admitted that several individuals, including mental health experts, had concluded petitioner

18  was malingering. RT 174-175.

19    In arguing the motion, defense counsel stated the issues were whether petitioner was

20  properly Mirandized at each interview and whether his admissions were voluntary. RT 177. He

21  continued,

22    In reading through the transcript I would acknowledge that in each of the three
     interrogations he was given the four basic admonishments contained in the San Jose
23    Police Department Miranda card which are pretty much standard throughout the United
     States. So, I don't consider the Miranda issue in and of itself to be a major issue. I think
24    the princip[al] issue right now is the voluntariness of the confession ….

25  RT 177-178.

26    The trial court found that petitioner "understood his *Miranda* rights, he waived those

27  rights, that he freely and voluntarily gave each of the statements he gave to the detective that was

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4329
JSW (PR)

30

1  conducting the interview.  ¶ … ¶  I think that from all of the evidence the Court is satisfied in

2  weighing all the factors that there was not any intent by the officer in this case to intentionally

3  mislead the defendant at the time the rights were administered, that's based on the totality of the

4  circumstances."  RT 184-185.

5  **B.  State Court Of Appeal's Ruling**

6      Defendant challenges the voluntariness of his implied *Miranda* waiver and of his
   admissions to the police.  Defendant argues that his implied waiver of rights and

7  statements to police were involuntary and unintelligent because (1) they were the product
   of "clever softening up" by Detective Gonzalez and (2) given defendant's mental

8  retardation, defendant's mere "mouthing" that he understood his rights did not signify that
   he actually did understand them.  According to defendant, the "softening up" began during

9  the seven hours Detective Gonzalez spent with defendant at the hospital, and continued
   during the first interview when the detective asked "friendly biographical questions,"

10  expressed empathy with defendant's immigrant experience, promised to help him, and
   told him that they could not help him or ask for God's forgiveness on his behalf "until you

11  tell us what all happen[ed]."  Defendant's claim that he lacked understanding of his rights
   is based on Dr. Silva's opinion that defendant did not even understand what a right was.

12  In short, defendant argues that his waiver and statements were psychologically coerced.

13      . . . .

14      Viewing the totality of the circumstances, we conclude after a careful and
   independent review of defendant's interview that defendant's *Miranda* waiver and

15  statements are voluntary and not motivated by police tactics or psychological coercion.
   (*People v. Kelly* [(1990)] 51 Cal.3d [931,] 953.)  First, with respect to defendant's

16  *Miranda* waiver, our independent review of the record supports Detective Gonzales'
   testimony that defendant was fully advised of his rights, and that pains were taken to

17  ensure that defendant understood his rights and that he acknowledged such understanding.
   We recognize, of course, that Dr. Silva diagnosed defendant as mildly mentally retarded

18  and mentally ill.  However, "defendant's low intelligence and psychiatric symptoms,
   standing alone, do not render his waiver of *Miranda* rights involuntary."  (*Id.* at p. 951.)

19  "'The sole concern of the Fifth Amendment, on which *Miranda* was based is
   governmental *coercion.*'"  (*Ibid.*)  Viewed in the totality of the circumstances, Dr. Silva's

20  entire testimony does not persuade us that defendant's waiver was involuntary, in the
   absence of evidence that the police in some way took advantage of defendant's mental

21  weaknesses. The evidentiary record contains no such evidence.

22      We also reject defendant's argument that defendant was subjected to "a clever
   softening up" at the hospital, and during the interrogation with expressions of empathy,

23  offers of help and invocations of God's forgiveness. Officer Gonzalez' testimony about
   his role at the hospital established at most that he hoped to develop a rapport between him

24  and defendant by intermittently making small talk and acting as translator between
   defendant and hospital staff. …  Here, while Officer Gonzalez may have made

25  "ingratiating conversation" with defendant, he did not disparage the victim and avoided
   any discussion of the offenses.  ([*People v. Honeycutt* (1977) 20 Cal.3d 150,] 160.)

26
27      Defendant argues that the officers' repeated offers to "help" defendant if he spoke
   "the truth" to them were improper.  We disagree.  "The business of police detectives is

28  investigation, and they may elicit incriminating information from a suspect by any legal

means." (*People v. Jones* (1998) 17 Cal.4th 279, 297.) Inducements to speak the truth are not always, or necessarily, coercive. "The line to be drawn between permissible police conduct and conduct deemed to induce or to tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police. Thus, 'advice or exhortation by a police officer to an accused to "tell the truth" or that "it would be better to tell the truth" unaccompanied by either a threat or a promise, does not render a subsequent confession involuntary.' [Citation.] [¶] ... When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity. On the other hand, if in addition to the foregoing benefit, or in the place thereof, the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear." (*People v. Hill* (1967) 66 Cal.2d 536, 549.)

Here, the officers did not offer defendant any tangible benefit for speaking the truth. No offer of lenient treatment by the police, prosecution or court was implied. Defendant acknowledged at one point that no promises had been made to him. Rather, telling the truth was offered as a benefit in and of itself: "And when we speak the truth, that is all that can help us, it is the only way, Enrique, the only way, which we can help you...." The police offered to help defendant tell the truth which, in turn, would help defendant feel better about himself, look at himself "in the mirror" and "ask God's forgiveness." Here, as in *People v. Jones,* the officers were, in effect, telling defendant that "'the truth is going to set you free.' We understand this exhortation, paraphrasing a verse in the Gospel According to John (John 8:32), not to promise leniency, but to suggest that telling the truth would relieve defendant of a psychological burden." (*People v. Jones, supra,* 17 Cal.4th at p. 298.)

Because it can be misunderstood, our Supreme Court in *Jones* disapproved of such an exhortation. (*People v. Jones, supra,* 17 Cal.4th at p. 298.) In the same vein, California courts have consistently condemned "the tactic of exploiting a suspect's religious anxieties." (*People v. Kelly, supra,* 51 Cal.3d at p. 953; see also *People v. Montano* (1991) 226 Cal.App.3d 914, 935 [interrogating officer "aggravated the situation by using their common religion to conjure up in defendant's mind the picture of confessing to avoid going to hell"]; *People v. Adams* (1983) 143 Cal.App.3d 970, 987-990, disapproved on another point in *People v. Hill* (1992) 3 Cal.4th 959, 995, fn. 3 [interrogating officer attended the same church as defendant and made repeated references to defendant's sin, guilt, apostasy, and "'reprobate mind'"]; but see *People v. Kelly,* at pp. 951-952 [no reversal where police interrogator asked defendant if he believed he was going to heaven, if his mother had given him a Christian upbringing and if he realized he had violated his Christian upbringing].)

We add our voices to those in disapproval; the officers in this case came perilously close to crossing the line of propriety. However, in this case, we are convinced that the officers' remarks, whether viewed singly or in combination, were not so coercive as to induce the defendant to confess involuntarily. As evidenced by his answers to the officers' exploratory questions about defendant's church-going, defendant did not appear to be particularly religious. (See *People v. Kelly, supra,* 51 Cal.3d at p. 953 ["no acute religious anxiety or sense of guilt was apparent from prior questioning"].) And, unlike the officers' religious references in *Adams* and *Montano,* here Sergeant Aberzini did not invoke the extreme "fire and brimstone" aspects of religion.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nor can we say that Sergeant Aberzini's invocation of God's forgiveness was the "motivating cause behind defendant's subsequent confession." (*People v. Kelly, supra,* 51 Cal.3d at pp. 953, 954.) On the one hand, it is clear from the totality of the circumstances that defendant wanted to talk about what he had done, but was too ashamed to do so without prompting. This is apparent from defendant's failure to take advantage of long pauses between questions to end the interrogation, and from the fact that he never stopped answering the officer's questions, or indicated that he wanted them to stop asking questions.

On the other hand, it also clear that Aberzini's offer of redemption through confession did not actually motivate defendant to make a cathartic confession. Although he did admit, shortly after Aberzini's comments, that he had done some things he should not have done, specific admissions were disclosed "bit by bit, piece by piece." In our view, the officers' interrogation techniques did not overbear the defendant's will to resist, and defendant's implied *Miranda* waiver and subsequent admissions were freely and knowingly given.

Exh. G at 21-22, 29-33, original italics.

### C.   The State Court Reasonably Rejected Petitioner's Claim

A *Miranda* waiver must be "voluntary" to be effective. *Colorado v. Connelly*, 479 U.S. 157, 169 (1986). It must also be knowing and intelligent. *United States v. Bautista-Avila*, 6 F.3d 1360, 1364 (9th Cir. 1993).

With respect to voluntariness, "the Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.' [Citation.] The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Colorado v. Connelly*, 479 U.S. at 170. "[A] defendant's mental condition, by itself and apart from its relation to official coercion, [does not] dispose of the inquiry into constitutional 'voluntariness.'" *Id*. at 164.

A waiver of *Miranda* rights need not be express so long as the totality of the circumstances indicates that it was knowing and voluntary. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *Juan H. v. Allen*, 408 F.3d 1262, 1271 (9th Cir. 2005). A state court's finding that a defendant knowingly and intelligently waived his *Miranda* rights is entitled to a presumption of correctness. *Amaya-Ruiz v. Stewart*, 121 F.3d 486, 495 (9th Cir. 1997).

The resulting statement must also be voluntary and not a product of police coercion. *Colorado v. Connelly*, 479 U.S. at 165. A statement will be considered involuntary if coercive police conduct, or "overreaching," causes the statement to no longer be "the product of a rational

1   intellect and a free will ...." *Blackburn v. United States*, 361 U.S. 199, 208 (1960); *see Amaya-Ruiz*

2   *v. Stewart*, 121 F.3d at 494 (test is whether, considering the totality of the circumstances, the

3   government obtained the statement by physical or psychological coercion or by improper

4   inducement so that the suspect's will was overborne).  To find a statement involuntary, there must

5   be coercive governmental conduct and the conduct must have in fact caused, or resulted in, the

6   statement. *Hutto v. Ross*, 429 U.S. 28, 30 (1976); *Juan H. v. Allen*, 408 F.3d at 1273 ("Coercion can

7   be mental or physical, but to render a statement involuntary, coercion must exist to such a degree

8   that the statement is not 'the product of an essentially free and unconstrained choice by its maker'").

9   "It is not enough ... that the police 'indicate that a cooperative attitude would be to [the] benefit'

10  of an accused unless such remarks rise to the level of being 'threatening or coercive.'" *Juan H. v.*

11  *Allen*, 408 F.3d at 1273; *see United States v. Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988).

12       As the state record shows, petitioner's trial counsel did not believe there was a "major

13  issue" as to the *Miranda* advisements or petitioner's waiver:  "In reading through the transcript I

14  would acknowledge that in each of the three interrogations he was given the four basic

15  admonishments contained in the San Jose Police Department Miranda card which are pretty much

16  standard throughout the United States.  So, I don't consider the Miranda issue in and of itself to be

17  a major issue."  RT 177-178.  Instead, counsel thought the "princip[al] issue" was the voluntariness

18  of petitioner's confession.  RT 178.

19       The state court of appeal found the record supported Detective Gonzalez's testimony that

20  petitioner was fully advised of his rights and that pains were undertaken to ensure he understood his

21  rights and that he acknowledged his understanding.  Those findings are entitled to a presumption of

22  correctness.  *Amaya-Ruiz v. Stewart*, 121 F.3d at 495.  As in *Amaya-Ruiz v. Stewart*, petitioner was

23  read his rights in Spanish, he indicated he understood them, and there was no indication he displayed

24  any signs of incompetency during his interrogation.  *See id*. at 495; *United States v. Bautista-Avila*,

25  6 F.3d at 1365-1366 (defendant's Mexican heritage and sixth grade education did not mean he could

26  not make a knowing and intelligent *Miranda* waiver).

27       The state court also found the record did not support Dr. Silva's opinion that petitioner

28

1    did not voluntarily waive his *Miranda* rights. Rather, the record showed the police officers did not

2    take advantage of petitioner's mental weaknesses. Accordingly, the court rejected petitioner's claim

3    that his *Miranda* waivers were involuntary. Exh. G at 29-30. The court further held that petitioner's

4    resulting confession was voluntary. It found he had not been inappropriately "softened up" by

5    Detective Gonzalez, and that the officers' inducements to speak the truth were not improper. The

6    officers did not offer petitioner any benefit for speaking the truth, a point that petitioner

7    acknowledged during the interviews. *Id*. at 30-31. The officers' remarks regarding speaking the

8    truth and asking God's forgiveness "were not so coercive as to induce the defendant to confess

9    involuntarily." *Id*. at 32. Moreover, petitioner was not particularly religious, and it did not appear

10   that the officer's invocation of God's forgiveness was the motivating cause behind petitioner's

11   confession. *Id*. Rather, the totality of the circumstances showed that petitioner wanted to talk about

12   what he had done, but was ashamed to do so without prompting. *Id*. The court concluded the

13   officers' interrogation techniques did not overbear petitioner's will to resist, and that his implied

14   *Miranda* waiver and subsequent admissions were freely and knowingly given. *Id*. at 33.

15         Petitioner fails to show the state court's findings of voluntariness were unreasonable.

16   Indeed, he makes no argument at all, other than summarizing his claim. Pet. at 6. In any event,

17   "[e]ncouraging [a suspect] to tell the truth … d[oes] not amount to coercion." *Amaya-Ruiz v.*

18   *Stewart*, 121 F.3d at 494. Where a defendant fails to establish "his confession was the product of

19   coercion, his alleged lack of intelligence and education does not render his confession involuntary."

20   *Id*. at 495; *see also Juan H. v. Allen*, 408 F.3d at 1273 (police statements that a cooperative attitude

21   would be to the benefit of an accused does not show involuntariness "unless such remarks rise to

22   the level of being 'threatening or coercive'"). Here, the record supports the state court's finding that

23   the officers' statements encouraging petitioner to speak the truth were not threatening or coercive.

24   Accordingly, he fails to show his admissions were involuntary.

25         Moreover, even if petitioner could have shown error, he cannot show it had a substantial

26   and injurious effect or influence in determining the jury's verdict. *Fry v. Pliler,* 127 S.Ct. at 2328.

27   Petitioner testified at length regarding the crimes. He admitted that he went to the house, stole a

28

safe, returned to the house, took Jeanette into a bedroom and removed her clothes (although he

denied they had sex), tied her up, put her in a box, put the box in his car, assaulted Pablo and Rosa,

took Jeanette to his home, and had sex with her twice over the course of the weekend, before finally

freeing her.  He also admitted hiding from the police and giving them a false name.  Petitioner

claimed on appeal that he would not have testified had his confessions been excluded.  However,

he also acknowledged that only his testimony could have supported his claimed defenses of duress

and idiocy.

Further, Jeanette gave a detailed account of the offenses, which was supported by physical

and forensic evidence found at her home as well as at petitioner's home, including DNA,

fingerprints, and stolen property.  Pablo and Rosa also gave detailed accounts that were supported

by physical evidence, as well as the neighbor's surveillance camera.  Jeanette and Pablo positively

identified petitioner, whom both had seen previously.  Jeanette was able to identify her place of

captivity by photographs of her classmates, and led the police directly to petitioner's home, where

he was found hiding in the attic.

In light of the overwhelming evidence against petitioner, he cannot demonstrate prejudice

from the admission of his confessions.  Accordingly, his claim should be rejected.

### III.

### THE STATE COURT REASONABLY REJECTED PETITIONER'S CLAIM THAT THE PROSECUTOR COMMITTED MISCONDUCT

Petitioner contends the trial court erred by failing to admonish the jury regarding remarks

the prosecutor made in his rebuttal closing argument.  The state court reasonably rejected his claim.

#### A.  State Court Of Appeal's Ruling

After some prefatory remarks at the beginning of his rebuttal argument, the
prosecutor argued:  "[Defense counsel] said you had three tasks.  You had to determine
what happened, then you had to determine whether he was a man of his right mind and,
three, whether or not he acted under duress.  That's not really altogether true.  [¶] We're
here to decide whether or not the prosecution has proved beyond a reasonable doubt that
the defendant committed the ten crimes charged in the information.  That's what you're
here for.  That is your only job. [¶] Now, he puts forth a defense, that doesn't mean there's
any legitimacy to it. [¶] ... [¶] Your job is to evaluate the evidence and to do two things
in that regard.  First, you have to take the step of, let's look at the facts here.  Are there
facts which are true that we can agree on that are put forth in his theory. [¶] ... [¶] The

second step is to take those facts and look at what the law is in that realm. Duress, Idiocy, and see whether or not, even if you do agree with the fact[s] [that] he puts forth whether or not the law says, oh, those apply and therefore he's exonerated. [¶] I need to make this point. We are at the guilt point here in this trial. Is he guilty? That is the only question. We're not dealing with insanity or anything like that. Is he guilty? [¶] *[Defense counsel] is saying he operated by duress. As a result, he's not guilty. He should walk out the door right behind you. He's saying he didn't know what he was doing, he's a legal idiot . He should walk out the door right behind you. That's what we're talking about right now. Let's not lose focus of that.* [¶] Now, let's talk about the facts about this claim about Jose...." (Italics added.)

No objection was interposed, and the prosecutor continued with his remarks about the factual and legal underpinnings of defendant's two defenses. The jury was then excused for the weekend with the understanding that on Monday the court would give its concluding instructions before asking the jury to begin its deliberations. On Monday morning, prior to the jury assembling, defendant objected to the prosecutor's remarks which are highlighted above on the grounds that (1) they impermissibly referred to the lack of punishment or penalty and (2) they were untrue, because defendant had a federal immigration hold that could subject him to federal prosecution and state prison even if he were acquitted. Defense counsel thus requested "that the jury be admonished to disregard the district attorney's comments that my client would be 'simply walking out the door' in the event he's acquitted of counts one through 10."

The trial court declined to admonish the jury, noting that the jury had already been properly instructed on dealing with the arguments of counsel, and also that the jury was not to consider the subject of penalty or punishment. On appeal, defendant renews his objection to the prosecutor's remarks as improper comment on possible punishment and misleading because defendant was "a poster boy for involuntary civil ... commitment." The People counter that defendant's lack of a contemporaneous objection waives the claim, that the comments were not improper when viewed in context, and that there is no reasonable likelihood the jury drew the most damaging meaning from the comments. We find no error here.

First, we agree with the People that defendant did not make a *timely* objection or request for admonition, and that defendant does not come within the exceptions to the rule barring appellate review: in our view, a timely objection would not have been futile and a contemporaneous admonition from the court would have cured any possible harm. (*People v. Hill* (1998) 17 Cal.4th 800, 820-821.) Furthermore, defense counsel did not argue below that the prosecutor's comment was misleading because defendant might be subject to civil commitment. (See *People v. Holt* (1984) 37 Cal.3d 436, 458 [assignment of error on appeal that prosecutor's comment was a misleading statement of parole law was waived because trial counsel did not raise it below].) The assignment of error is waived.

However, even without waiver, the objection is not well taken here. "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citation.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970.)

"It is settled that in the trial of a criminal case the trier of fact is not to be concerned with the question of penalty, punishment or disposition in arriving at a verdict as to guilt or innocence." (*People v. Allen* (1973) 29 Cal.App.3d 932, 936, fn. omitted.) But it is

also true that "[j]urors, in common with people in general, are aware of the meanings of verdicts of guilty and not guilty.  It is common knowledge that a verdict of not guilty means that the prisoner goes free and that a verdict of guilty means that he is subject to such punishment as the court may impose." (*Lyles v. United States* (D.C. Cir. 1957) 254 F.2d 725, 728,overruled in part by *U.S. v. Brawner* (D.C. Cir. 1972) 471 F.2d 969, 996.)

Tellingly, in our view, none of the cases cited by defendant involves a prosecutor's remarks during the guilt phase of a criminal trial in which he or she informs the jury that a verdict of not guilty means the defendant will go free. …

Here, the comment by the prosecutor did no more than restate the obvious. Moreover, neither the comment nor the rest of the prosecutor's rebuttal argument in any way suggested to the jury that it should reject defendant's duress and idiocy defenses *because* defendant would "walk out the door."  On the contrary, the prosecutor spent the remainder of his rebuttal argument painstakingly reviewing the evidence and the law and arguing that the defenses should be rejected on that basis.

We do not mean to suggest that it is ever proper in the guilt phase of a criminal trial to foster jury speculation about the ultimate disposition of charges after the jury's verdict, whether that disposition is acquittal or conviction.  However, in this case, we perceive no reasonable likelihood that the jury misconstrued the prosecutor's fleeting comment as encouragement to reject defendant's defenses because he should not be set free.  In our view, any hint of such a suggestion was adequately addressed and dispelled by the court's general instructions that the jury must follow the law as stated by the court, not the attorneys, that statements by attorneys are not evidence and that it must "not discuss or consider the subject of penalty or punishment, that subject must not in any way affect your verdicts."  No error appears.

Exh. G at 47-51, original italics.

## B.  The State Court's Rejection Of Petitioner's Claim Was Reasonable

As an initial matter, the state court found petitioner's claim was barred because petitioner failed to make a specific and contemporaneous objection to the prosecutor's challenged remarks. Claims that were not properly raised in the trial court are procedurally defaulted and may not be considered on federal habeas corpus absent a showing of cause for the default and prejudice as a result. *Bonin v. Calderon*, 59 F.3d 815, 842-43 (9th Cir. 1995); *see Davis v. Woodford*, 384 F.3d 628, 654 (9th Cir. 2004) (claim was procedurally defaulted where no constitutional objection was raised at trial); *Rich v. Calderon*, 187 F.3d 1064, 1070 (9th Cir. 1999) (claim was procedurally defaulted where no objection to prosecutor's closing argument was made).  Since petitioner fails to show cause for his procedural default, indeed, fails even to acknowledge it, and fails to show he was prejudiced as a result, his claim should not be considered on federal habeas corpus.

Even if this Court considers the claim, petitioner is not entitled to relief because the claim

1  fails on the merits.  Petitioner contends the prosecutor's remarks impermissibly suggested the jury

2  should consider the consequences of an acquittal on the charges.  "To constitute a due process

3  violation, the prosecutorial misconduct must be so severe as to result in the denial of [the

4  defendant's] right to a fair trial." *Bonin v. Calderon*, 59 F.3d at 843; *see Darden v. Wainwright*, 477

5  U.S. 168, 181 (1986).  Jurors accord less weight to the arguments of counsel than to the instructions.

6  *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 898 (9th Cir. 1996).  "A court should not lightly infer that

7  a prosecutor intended an ambiguous remark to have its most damaging meaning or that a jury, sitting

8  through lengthy examination, will draw that meaning from the plethora of less damaging

9  interpretations." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974).  A cautionary instruction

10  that statements made by the attorneys are not evidence, as given here, is presumed to have been

11  followed by the jury.  *James v. Borg*, 24 F.3d 20, 28, n.4 (9th Cir. 1994); *see Richardson v. Marsh*,

12  481 U.S. 200, 211 (1987).  Because the standard of review on federal habeas corpus is "the narrow

13  one of due process, and not the broad exercise of supervisory power," even improper argument does

14  not necessarily violate a defendant's constitutional rights.  *Thompson v. Borg*, 74 F.3d 1571, 1576

15  (9th Cir. 1996); *see Brown v. Payton*, 544 U.S. 133, 143-47 (2005).  Even if error is found, relief

16  may not be granted unless the error had a substantial and injurious effect or influence in determining

17  the jury's verdict.  *Bonin v. Calderon*, 59 F.3d at 843.

18         Here, the state court reasonably found the prosecutor's remarks did not constitute

19  misconduct.  In the context of the argument, the prosecutor was not suggesting the jury convict

20  petitioner so that he could not "walk out the door."  Rather, he was explaining to the jury that it was

21  deciding the guilt phase, not the sanity phase, and thus it needed to focus on the evidence of the

22  charges and petitioner's defenses.  The prosecutor then reviewed petitioner's defenses in detail,

23  explaining why they were not supported by the evidence.  Moreover, as the court of appeal found,

24  the prosecutor did no more than "restate the obvious" in light of common knowledge that a not

25  guilty verdict meant a defendant goes free.  Exh. G at 50; *see Lyles v. United States*, 254 F.2d 725,

26  728 (D.C. Cir. 1957) (common knowledge that a verdict of not guilty means the prisoner goes free),

27  *overruled in part by United States v. Brawner*, 471 F.2d 969, 996 (D.C. Cir. 1972).  The challenged

28

1    remarks did not deprive petitioner of a fair trial.

2         In light of the overwhelming evidence that petitioner committed the charged offenses, and

3    the weakness of the defense evidence of duress and idiocy, petitioner also cannot show he was

4    prejudiced by the prosecutor's remarks even if they were improper.  Accordingly, his claim should

5    be rejected.

6                                         **IV.**

7    **THE STATE COURT REASONABLY REJECTED PETITIONER'S**
     **CLAIM THAT THE TRIAL COURT SHOULD HAVE INSTRUCTED**
8    **THE PROSECUTION BORE THE BURDEN TO PROVE ABSENCE OF**
     **DURESS BEYOND A REASONABLE DOUBT**
9

10        Petitioner contends the trial court erred by failing to instruct the jury that the prosecution

11   bore the burden to prove the absence of duress beyond a reasonable doubt.  The state court

12   reasonably rejected petitioner's claim.

13        The trial court instructed with CALJIC No. 4.40 on duress as follows:

14        A person is not guilty of the crime when he engages in conduct otherwise criminal
          when acting under threat or menace under the following circumstances:
15        One, where the threats and menace are such that they would cause a reasonable
          person to fear that his life would be in immediate danger if he did not engage in the
16        conduct charged; and,
          Two, if this person actually believed that his life was so endangered.
17        This rule does not apply to threats, menace and fear of future danger to his life.
          "Menace" means a threat of harm expressed or implied by words or act.
18

19   RT 1988. Petitioner contended the instruction was erroneous because CALCRIM No. 3402, which

20   was not in effect at the time of petitioner's trial, had added language that placed the burden on the

21   prosecution to prove the absence of duress beyond a reasonable doubt.  *See* Exh. G at 33, n.6.

22   CALJIC No. 4.40 did not specify a burden of proof.  The state court rejected petitioner's claim in

23   pertinent part as follows:

24        This error, [petitioner] contends, deprived him of his due process right to a fair trial.
          We disagree.  First, "CALJIC instructions do not constitute legislative or decisional law
25        and thus cannot implicate … due process." (*People v. Brown* (2004) 33 Cal.4th 382, 392.)
          Second, the Due Process Clause is not offended by jury instructions that "place[] the
26        burden on [the defendant] to establish the existence of duress by a preponderance of the
          evidence." (*Dixon v. United States* (2006) 126 S.Ct. 2437, 2442.)  And finally, "not every
27        ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due
          process violation.  The question is whether the ailing instruction … so infected the entire
28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4329
JSW (PR)

1  trial that the resulting conviction violates due process." (*People v. Huggins, supra,* 38
2  Cal.4th at p. 192, internal quotation marks omitted.) Due process is certainly not offended
   by instructions which do not place any burden on defendant.

3  Exh. G at 34. The court also rejected petitioner's claim under state law. Exh. G at 34-38. We do

4  not address those issues because state law claims are not cognizable on federal habeas corpus.

5  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

6      The state court's rejection of petitioner's federal claim was reasonable. In *Dixon v. United*

7  *States*, 548 U.S. 1, 126 S.Ct. 2437 (2006), the court rejected the claim that the prosecution

8  necessarily bore the burden of proving the absence of duress beyond a reasonable doubt. The court

9  noted, "the defense of duress does not negate a defendant's criminal state of mind when the

10 applicable offense requires a defendant to have acted knowingly or willfully; instead, it allows the

11 defendant to 'avoid liability … because coercive conditions or necessity negates a conclusion of

12 guilt even though the necessary *mens rea* was present.'" 126 S.Ct. at 2442. The court found there

13 is "no constitutional basis for placing upon the Government the burden of disproving petitioner's

14 duress defense beyond a reasonable doubt." *Id*. Jury instructions that require a defendant to

15 establish duress by a preponderance of the evidence do not violate due process. *Id*.

16     In light of *Dixon*, petitioner's claim that the trial court violated his right to due process by

17 failing to instruct that the prosecution bore the burden to disprove duress beyond a reasonable doubt

18 is without merit. Moreover, as the state court noted, CALJIC No. 4.40 did not place any burden of

19 proof on petitioner. Instead, it instructed he was *not guilty* when he engaged in conduct otherwise

20 criminal under circumstances constituting duress. RT 1988. The trial court instructed that the

21 prosecution bore the burden of proving petitioner's guilt beyond a reasonable doubt. RT 1870. It

22 reiterated the reasonable doubt instruction near the conclusion of its instructions. RT 1991. The

23 requirement that the prosecution prove each element of the offense charged beyond a reasonable

24 doubt effectively encompassed a negation of any defense petitioner proffered as to those elements.

25 No additional instruction was required. Proof of each crime beyond a reasonable doubt was

26 sufficient. *See Dixon v. United States*, 126 S.Ct. at 2446.

27     Moreover, any error was harmless. *Brecht v. Abrahamson*, 507 U.S. at 637. The evidence

28

1    of duress was not compelling, particularly because petitioner never testified, nor did the evidence

2    show, that he responded to a threat of "immediate and imminent danger" when he committed the

3    crimes.  "Duress is an effective defense only when the actor responds to an immediate and imminent

4    danger.  '[A] fear of *future* harm to one's life does not relieve one of responsibility for the crimes

5    he commits.'"  *People v. Heath*, 207 Cal.App.3d 892, 900 (1989), original italics.  Since petitioner

6    testified only to a fear of future harm, the defense was inapplicable.  Further, Jose testified and

7    denied even knowing petitioner.  The jury evidently rejected petitioner's testimony to the contrary.

8    Since petitioner can show neither error nor prejudice, his claim should be rejected.

9                                               **V.**

10   **THE STATE COURT REASONABLY REJECTED PETITIONER'S**
     **CLAIM THAT THE TRIAL COURT ERRED IN INSTRUCTING ON**
11   **IDIOCY**

12           Petitioner contends the instruction defining idiocy, CALJIC No. 4.47, was incorrect in

13   three respects because CALCRIM No. 3455, which was not in effect at the time of his trial, stated

14   the elements differently.  To the extent petitioner's claim is based on state law, it is not cognizable

15   on federal habeas corpus.  *Estelle v. McGuire*, 502 U.S. at 67.  The state court reasonably rejected

16   petitioner's claim.

17   **A.    State Court Record**

18           Early in the trial, the court and parties discussed the defense of idiocy and the

19   prosecution's burden of proof.  The court stated, "We also wanted to memorialize, at this time, the

20   fact that counsel agree that the prosecution has the burden with respect to the issue of idiocy . …

21   And perhaps maybe I should let counsel place their comments of record at this time." RT 253.  The

22   prosecutor stated,

23           Upon reviewing the CALJIC instruction 4.47 its use note and the cases cited, the use
             notes and the citation at 83 Cal.App.4th, 170, it is the People's recognition that where the
24           defense raises the issue of idiocy under Penal Code section 26, it is the defendant's burden
             of producing evidence of idiocy, but the People have the ultimate burden of proving the
25           legal capacity to commit a crime beyond a reasonable doubt.
             I think defense counsel agrees with that.
26

27   RT 254.  Defense counsel stated, "Your Honor, I would stipulate to that." *Id.*

28

1             Shortly before the court was to instruct the jury at the guilt phase, however, defense

2    counsel raised an objection to CALJIC No. 4.47.

3             Your Honor, I want to, at this time, make an objection to the court giving CALJIC
     instruction 4.47, which refers to Penal Code section 26, defense of idiocy. I have asked
4    for an instruction on idiocy, but I believe the CALJIC instruction is not up to date, given
     the case of People versus Phillips, 83 Cal.App.4th, 170.
5             In that case in the very last paragraph holds that the test for idiocy is the same as that
     for legal insanity. So I'm, therefore, suggesting to the court and offering an alternative
6    section, an alternative instruction, a modified instruction of CALJIC 4.00 which basically
     defines insanity. And I would propose that it be worded as follows ....

7

8    RT 1855. The court stated, "I think they're both the same, the elements are both the same." *Id.*

9    Defense counsel responded,

10            No, they're incorrect.
              I would say a person legally defined as an idiot by reasons of mental disease or
11   defect, he was incapable of, number one, knowing the nature and quality of his act or,
     number two, understanding the nature and quality of his act or, number three,
12   distinguishing right from wrong at the time of the commission of the crime.
              Now, I acknowledge that those elements are included in 4.47, but what I particularly
13   object to is the first two paragraphs which define idiocy as an extreme mental deficiency.
     Now that People versus Phillips basically says the test for insanity and idiocy are
14   equivalent.
              I believe the first two paragraphs of 4.47 are extraneous and do [*sic*] longer comport
15   with the current frame of the law. I believe that's a throwback from the 1970's when
     idiocy and insanity were not necessarily identical concepts.
16

17   RT 1855-1856. The court disagreed, stating,

18            But the comment with respect to 4.47 takes into account and it also indicates, that
     although the test may be the same and views it as being the same, that idiocy [*sic*] stands
19   alone. And so, as it stands alone, CALJIC has provided the instruction for the defense of
     idiocy and they had the Phillips case in mind at the time that it was drafted.
20            And although you're proposing the modification, at this point in time, unless,
     [prosecutor], you have a comment you wish to place of record, I'm prepared to rule on it.
21

22   RT 1856. Hearing no further comment, the court denied defense counsel's requested modification,

23   adding,

24            You're asking the court to modify the instruction dealing with insanity to dovetail
     into your understanding of idiocy as a defense pursuant to the Phillips case. And I'm
25   going to reject that and accept the 4.47 instruction as drafted and provided in the most
     recent CALJIC edition of July 2004.
26

27   *Id.*

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4329
JSW (PR)

1    In light of the court's ruling, defense counsel asked that CALJIC No. 4.47 be read in its

2  entirety, including the bracketed portion in the first paragraph, which request the court granted.  RT

3  1856-1857.  The court later gave CALJIC No. 4.47 as follows:

4        Idiocy is an extreme mental deficiency.  This mental deficiency often is congenital
     or is caused by an arrested development of the brain caused by disease or injury in early
5     childhood.  The deficiency may also be caused by brain damage from disease or injury
     sustained in later years.
6        An idiot is a person who lacks capacity to commit crime, and therefore is not
     responsible for what otherwise would be criminal conduct.  An idiot is a person who
7     suffers from mental deficiency and the degree of mental impairment is such that he is
     incapable, by reason of that deficiency of, one, knowing the nature and quality of his act;
8     or
        Two, understanding the nature and quality of his act; or,
9        Three, distinguishing right from wrong at the time of the commission of the alleged
     crime.
10        Evidence has been received which may tend to show the defendant suffered from the
     mental impairment of idiocy.  If after a consideration of all the evidence, you have a
11     reasonable doubt the defendant had the legal capacity to commit the crime, the defendant
     must be found not guilty.

12

13  RT 1988-1989.

14  **B.    The State Court Of Appeal Reasonably Rejected Petitioner's Claim**

15    In criminal trials, "not every ambiguity, inconsistency, or deficiency in a jury instruction

16  rises to the level of a due process violation.  The question is whether the ailing instruction … so

17  infected the entire trial that the resulting conviction violates due process.  [Citation.]  [A] single

18  instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of

19  the overall charge.  [Citation.]  If the charge as a whole is ambiguous, the question is whether there

20  is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates

21  the Constitution."  *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (per curiam), internal quotation

22  marks omitted;  *see Estelle v. McGuire*, 502 U.S. at 72 & n.4; *Cupp v. Naughten*, 414 U.S. 141, 147-

23  48 (1973).  In addressing this question, courts should not engage in speculation.  "Differences

24  among [jurors] in interpretation of instructions may be thrashed out in the deliberative process, with

25  commonsense understanding of the instructions in the light of all that has taken place at the trial

26  likely to prevail over technical hairsplitting."  *Boyde v. California*, 494 U.S. 370, 380-81 (1990).

27    The state court of appeal set out petitioner's objections to CALJIC No. 4.47, each of which

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4329
JSW (PR)

1   was based on language that differed from the instruction in CALCRIM No. 3455.  Exh. G at 39.  The

2   court stated,

3       At the outset we observe that the CALCRIM instruction was not available when this
        case was tried.  The CALCRIM instructions are "approved by the Judicial Council" and

4       are now "the official instructions for use in the state of California."  (Cal. Rules of Court,
        rule 2.1050(a).)  The Judicial Council's imprimatur does not, however, guarantee their

5       correctness or necessarily render the CALJIC instructions retroactively incorrect.  On the
        contrary, although the Judicial Council "endorses these instructions for use and makes

6       every effort to ensure that they accurately state existing law[,] [t]he articulation and
        interpretation of California law … remains within the purview of the Legislature and the

7       courts of review."  (*Id*., rule 2.1050(b).)

8   Exh. G at 39-40.

9       The court then addressed each of petitioner's contentions individually in light of the

10  applicable state law.  It concluded the definition of idiocy as an extreme mental deficiency, i.e., a

11  severe form of mental retardation, was correct under state law.  Exh. G at 40-44.  It next rejected

12  petitioner's claim that the instructions failed to make clear that a defendant must be incapable of

13  distinguishing right from wrong with respect to the offenses charged as opposed to distinguishing

14  right from wrong in the abstract.  The correctness of the CALJIC instruction had recently been

15  reaffirmed by the state supreme court.  Although the court of appeal found the new CALCRIM

16  instruction was clearer on the point than the CALJIC instruction, it found there was no reasonable

17  likelihood the jury misunderstood the instruction given.  Exh. G at 44-45.  The court of appeal also

18  rejected petitioner's contention that CALJIC No. 4.47 failed to distinguish between legal and moral

19  wrong.  The court noted the instruction had been upheld by the state supreme court and restated the

20  relevant statutory language.  The court also noted that attempts to distinguish legal and moral wrong

21  had been found erroneous.  "In our view, the CALJIC instructions given here correctly stated the

22  law and were responsive to the evidence.  No further instruction was required to be given sua sponte.

23  If defendant believed clarification or amplification was needed, he should have requested it."  Exh.

24  G at 46-47.

25      The court of appeal addressed petitioner's contentions almost entirely as a matter of state

26  law.  To that extent, his contentions are not cognizable on federal habeas corpus.  *Estelle v.*

27  *McGuire*, 502 U.S. at 67.  The court also found there was no reasonable likelihood the jury

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4329
JSW (PR)

45

1  misunderstood the requirements of state law.  *See id.* at 72.  As the court of appeal explained, the

2  CALJIC instruction given was the applicable instruction at the time of petitioner's trial.  It had been

3  upheld by the state supreme court and restated the relevant statutory language.  Accordingly,

4  petitioner's unsupported claim that the instruction on idiocy was incorrect should be rejected.

5                                                   **VI.**

6  **THE STATE COURT REASONABLY REJECTED PETITIONER'S**
   **CLAIM OF CUMULATIVE ERROR**
7

8          Petitioner contends that cumulative guilt phase error (claims two through five) violated

9  his rights to due process and a fair trial.  The state court of appeal rejected petitioner's claim as

10  follows:

11          Defendant contends that the errors committed at the guilt phase of defendant's
        criminal trial were cumulatively prejudicial and deprived him of a fair trial.  "[A] series
12        of trial errors, though independently harmless, may in some circumstances rise by
        accretion to the level of reversible and prejudicial error."  (*People v. Hill, supra,* 17
13        Cal.4th at pp. 844-845.)  However, we have found that defendant's statements and
        *Miranda* waivers were not involuntary; the trial court's refusal to admonish the jury about
14        the prosecutor's comments was not error; and the instructions on duress and idiocy were
        not incorrect.  Thus, we find defendant's claim of cumulative prejudice without merit.
15

16  Exh. G at 51.

17          The state court's rejection of petitioner's claim was reasonable.  As shown above,

18  petitioner fails to demonstrate any error or prejudice and consequently cannot demonstrate

19  cumulative error or prejudice.

20                                                   **VII.**

21  **THE STATE COURT REASONABLY REJECTED PETITIONER'S**
   **CLAIM THAT THE TRIAL COURT ERRED IN INSTRUCTING ON**
22  **INSANITY**

23          Petitioner repeats two of the contentions he raised with respect to the instruction on idiocy,

24  specifically, that the third prong of CALJIC No. 4.00 failed to adequately distinguish between an

25  abstract understanding of right and wrong and an understanding of right and wrong with respect to

26  the acts charged, and the right and wrong formulation failed to specify that the defendant must

27  appreciate both legal and moral wrong.  As with his earlier argument, he relies on the language of

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4329
JSW (PR)

1  CALCRIM No. 3450, which was not in effect at the time of his trial, to argue the CALJIC

2  instruction was incorrect.  The third prong of CALJIC Nos. 4.00 and 4.47 is the same.  *See* CT 453,

3  556.  The state court reasonably rejected petitioner's claim.

4          When addressing petitioner's contentions with respect to the idiocy instruction, the court

5  of appeal also considered whether the instruction on insanity was deficient for the same reasons, and

6  concluded it was not.  The court concluded the instruction had been reaffirmed by the state supreme

7  court and restated the relevant statutory language. Exh. G at 44-47. Also, there was "no reasonable

8  likelihood that in the process of evaluating each charge, the jury misunderstood the instructions to

9  mean that if defendant understood right from wrong in the abstract he could not be acquitted, or

10  found insane, even though he not understand that it was wrong to do each act, that is, to burglarize

11  a house, assault its residents and rape and kidnap a child." Exh. G at 45.  As to the second

12  contention, the court stated that CALJIC Nos. 4.00 and 4.47 restated the statutory language and had

13  "never been found to be erroneous on this score." Exh. G at 46.  Since the CALJIC instructions

14  were correct, and efforts to modify them had been found erroneous, no further instruction was

15  required to be given sua sponte.  If petitioner wanted additional clarification or amplification, he

16  should have requested it.  Exh. G at 46-47.

17          As with the idiocy instruction, petitioner's claim is based primarily on state law and thus

18  fails to state a cognizable claim.  *Estelle v. McGuire*, 502 U.S. at 67.  The court also found there was

19  no reasonable likelihood the jury misunderstood the requirements of state law.  *See id*. at 72.  As the

20  court of appeal explained, the CALJIC instruction given was the applicable instruction at the time

21  of petitioner's trial.  It had been upheld by the state supreme court and restated the relevant statutory

22  language.  Accordingly, petitioner's unsupported claim that the instruction on insanity was incorrect

23  should be rejected.

24

25

26

27

28

## VIII.

### THE STATE COURT REASONABLY REJECTED PETITIONER'S CLAIM THAT THE TRIAL COURT ERRED BY APPLYING THE AGGRAVATED KIDNAPPING ENHANCEMENT TO THREE OFFENSES

Petitioner contends the trial court improperly imposed one-strike sentence enhancements on counts seven, eight, and nine. He argues the sentences violated California Penal Code section 654, as well as his rights under the due process and double jeopardy clauses, and his liberty interest in the correct application of state law. The state court reasonably rejected his claim.

The jury convicted petitioner in counts seven, eight, and nine of offenses specified in California Penal Code section 667.61(c) (two counts of forcible sexual penetration and one count of forcible lewd act upon a child under 14) during the commission of a kidnapping within the meaning of section 667.61(d)(2).[11] Each such conviction warranted a sentence of 25 years to life. Cal. Penal Code § 667.61(a). The trial court thus imposed three life terms. RT 2315-2316. On appeal, petitioner contended the three life terms were improper under California Penal Code section 654 because there was no separate intent underlying the kidnapping other than the charged sex offenses.

### A.    State Court Of Appeal Opinion

The state court of appeal rejected petitioner's contention as follows:[12]

> Section 654 provides, in relevant part, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Section 654 is intended "to ensure that a defendant's punishment will be commensurate with his [or her] culpability." (*People v. Perez* (1979) 23 Cal.3d 545, 552.) As relevant here, section 654 bars multiple punishment for multiple acts, where those acts comprise an indivisible course of conduct

---

11. California Penal Code section 667.61(d)(2) provides: "The defendant kidnapped the victim of the present offense and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense in subdivision (c)."

12. The court noted the question whether California Penal Code section 654 applied to section 667.61 had not been resolved, but assumed for purposes of its discussion that it did. Exh. G at 53 & n.13.

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4329 JSW (PR)

48

incident to a single criminal objective and intent.  (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208; *Neal v. State of California* (1960) 55 Cal.2d 11, 19.)  "On the other hand, if the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for the independent violations committed in pursuit of each objective even though the violations were parts of an otherwise indivisible course of conduct."  (*People v. Perez, supra,* 23 Cal.3d at p. 551, fn. omitted.)  As our Supreme Court observed in *Latimer:*  "Decisions since *Neal* have ... narrowly interpreted the length of time the defendant had a specific objective, and thereby found similar but *consecutive* objectives permitting multiple punishment.  (E.g., *People v. Harrison* [1989] 48 Cal.3d [321,] 334-338 [multiple sex crimes each have the separate objective of achieving additional sexual gratification]; *People v. Perez, supra,* 23 Cal.3d at pp. 551-554 [similar].)"  (*People v. Latimer, supra,* 5 Cal.4th 1203, 1211-1212.)

Whether a single course of conduct is divisible into different offenses based on separate objectives and intents is a question of fact for the trial court, and its express or implicit findings will be upheld on appeal when they are supported by substantial evidence.  (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)  As with other substantial evidence determinations, we review the trial court's findings here in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence.  (*Ibid.*)

Defendant assumes the trial court separately punished him for kidnapping and sex crimes, and that the sole objective of the kidnapping was to commit the sex acts, but we think both assumptions are incorrect.  Here, the separately punished acts were not one kidnapping and three sexual assaults but rather three separate sexual assaults, each of which substantially increased the danger to the victim over and above the risk inherent in the sex act itself, and each of which was accomplished by different means.  Moreover, defendant paints his objective with too broad a brush.  In this regard *People v. Perez* is instructive.  There, the court held that in a case of multiple sex crimes committed against a single victim over a 45-minute period, the intent and objective of obtaining sexual gratification "is much too broad and amorphous to determine the applicability of section 654.  Assertion of a sole intent and objective to achieve sexual gratification is akin to an assertion of a desire for wealth as the sole intent and objective in committing a series of separate thefts.  To accept such a broad, overriding intent and objective to preclude punishment for otherwise clearly separate offenses would violate the statute's purpose to insure that a defendant's punishment will be commensurate with his culpability."  (*People v. Perez, supra,* 23 Cal.3d at p. 552.)

Here, the trial court expressly found that the sex offenses were committed on separate occasions—a finding defendant does not challenge.  In our view, the trial court implicitly found that defendant harbored separate and independent objectives and intents with respect to each of the sex offenses.  The record supports the court's findings.  The sex offenses charged in counts 7, 8 and 9 were committed several hours apart over three days.  With each renewed assault, the threat of harm to J. from her foreseeable attempts to escape her captor was ratcheted upwards another notch.  Each new assault carried its own separate intent and objective for additional sexual gratification.  We find the court did not err in concluding that section 654 permits separate punishment for each sex act here.

Exh. G at 53-55, original italics.

1    **B.    The State Court Reasonably Rejected Petitioner's Claim**

2    To the extent petitioner's claim is based on a violation of state law, it is not cognizable.

3    *Estelle v. McGuire*, 502 U.S. at 67; *cf. Beaty v. Stewart*, 303 F.3d 975, 986 (9th Cir. 2002) (claim

4    of error in state trial court's decision to impose consecutive sentences did not present federal

5    question); *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507-08 (9th Cir. 1994) (same).  On appeal,

6    petitioner summarily argued that his sentences also violated due process, by not following state law,

7    and violated double jeopardy.  Exh. D at 76.  His contentions are not supported by relevant law.

8    The misapplication of state law results in a due process violation only if the sentence is

9    arbitrary and capricious.  *Richmond v. Lewis*, 506 U.S. 40, 50 (1992).  The court of appeal rejected

10   petitioner's claim that his sentences violated California Penal Code section 654, a point he does not

11   address in his federal petition.[13]  Further, a defendant has a liberty interest only in a state law that

12   imposes a mandatory obligation, which was not the case here. *See Clemons v. Mississippi*, 494 U.S.

13   738, 745-47 (1990).  Petitioner thus failed to establish any misapplication of state law.  He did not

14   argue, nor does the record show, the sentences imposed were arbitrary and capricious in light of the

15   applicable state law.

16   The Double Jeopardy Clause protects against multiple punishments for the same offense.

17   *Hudson v. United States*, 522 U.S. 93, 99 (1997); *Brown v. Ohio*, 432 U.S. 161, 165 (1977).

18   However, as relevant here, double jeopardy protects only against multiple punishment when it

19   occurs in successive proceedings.  *Hudson v. United States*, 522 U.S. at 99, *citing Missouri v.*

20   *Hunter*, 459 U.S. 359, 366 (1983).  "With respect to cumulative sentences imposed in a single trial,

21   the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater

22   punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. at 366.  "Where, as here,

23   a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether

24   those two statutes proscribe the 'same' conduct under *Blockburger* [*v. United States*, 284 U.S. 299

25   (1932)], a court's task of statutory construction is at an end and the prosecutor may seek and the trial

26

27       13.  The correctness of the trial court's sentencing under California Penal Code section

28   667.61 is discussed in respondent's brief on appeal.  Exh. E at 71-74.

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4329
JSW (PR)

1  court or jury may impose cumulative punishment under such statutes in a single trial." *Missouri v.*

2  *Hunter*, 459 U.S. at 368-69; *see Williams v. Borg*, 139 F.3d 737, 743-744 (9th Cir. 1998) (imposition

3  of two sentence enhancements based on two convictions for oral copulation committed during the

4  course of one kidnapping did not violate double jeopardy under California law).

5       The California Legislature specifically provided that a defendant must be punished for

6  each offense committed during the course of an aggravated kidnapping.  Cal. Penal Code § 667.61;

7  *see People v. Hammer*, 30 Cal.4th 756, 761 (2003).  "The only limitation on the number of life

8  sentences which can be imposed is contained in section 667.61, subdivision (g), which provides that

9  the defendant shall be sentenced to one life term per victim per occasion no matter how many

10  offenses listed in subdivision (c) the defendant committed against a particular victim on a particular

11  occasion." *People v. Murphy*, 65 Cal.App.4th 35, 40 (1998).  In *People v. Jones*, 25 Cal.4th 98, 107

12  (2001), the California  Supreme Court concluded that, "for the purposes of Penal Code section

13  667.61, subdivision (g), sex offenses occurred on a 'single occasion' if they were committed in close

14  temporal and spatial proximity."  As the trial court found here, petitioner's commission of three sex

15  offenses against the victim in his home were separated by several hours and spanned three days.

16  Thus, they were not committed in "close temporal or spatial proximity."  *Cf. People v. Jones*, 25

17  Cal.4th at 101 (multiple sex acts committed in car within one and a half hours).[14]

18       Petitioner failed to show that his sentences were imposed in violation of state law, or that

19  they violated due process or double jeopardy.  Since the state court reasonably rejected his claim of

20  error, his claim here should also be rejected.

21                                    **IX.**

22  **THE  STATE  COURT  REASONABLY  REJECTED  PETITIONER'S
    CLAIM THAT HIS SENTENCES VIOLATED EQUAL PROTECTION**

23

24       Petitioner contends that his 25-year-to-life terms violated equal protection because he

25  could have received 15-year-to-life terms instead.  The state court reasonably rejected petitioner's

26  _____

27       14.  Since the decision in *People v. Jones*, 25 Cal.4th 98, the statute has been amended to

28  broaden application of multiple life sentences.  *See* Cal. Penal Code §§ 667.6(d), 667.61(i).

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4329
JSW (PR)

51

1    claim.

2          The information alleged that in the commission of counts seven, eight, and nine petitioner

3    kidnapped the victim and the movement substantially increased the risk of harm to the victim over

4    and above that inherent in the underlying offenses.  Cal. Penal Code § 667.61(d)(2).  As to count

5    seven, the information also alleged that petitioner engaged in tying and binding the victim.  Cal.

6    Penal Code § 667.61(e)(6).  As to count eight, the information alleged that petitioner personally used

7    a deadly and dangerous weapon.  Cal. Penal Code § 667.61(e)(4).  The jury found all of these

8    allegations to be true.  CT 538-546; *see* CT 614.

9          Under section 667.61(a), a finding of one or more circumstances under subdivision (d) or

10   two or more circumstances under subdivision (e) required imposition of a 25-year-to-life term.  *See*

11   *People v. Hammer,* 30 Cal.4th at 761.  "Except as provided in subdivision (a)," a finding of one

12   circumstance under subdivision (e) required imposition of a 15-year-to-life term.  Cal. Penal Code

13   § 667.61(b).

14         The trial court imposed three 25-year-to-life terms based on the jury's findings under

15   section 667.61(d).  It stated the jury's findings under section 667.61(e) were moot.  RT 2315.

16   **A.    State Court Of Appeal's Ruling**

17         The state court rejected petitioner's claim as follows:

18         Defendant argues that (1) the disparity creates an unconstitutional "risk of arbitrary
       application of the statute based solely on prosecutorial charging discretion" and that (2)
19     the legislative classification is irrational.  We disagree on both counts.

20         A similar attack on the exercise of prosecutorial discretion was rebuffed in *Manduley
       v. Superior Court* (2002) 27 Cal.4th 537, where it was argued that in enacting Proposition
21     21, "the legislative branch unconstitutionally ... conferred upon the executive branch (that
       is, the prosecutor) an exclusively judicial function of choosing the appropriate dispositions
22     for certain minors convicted of specified crimes" by giving the prosecutor unfettered
       charging discretion.  (*Id.* at p. 552)  Our Supreme Court disagreed, stating:  "[T]he
23     prosecuting authorities, exercising executive functions, ordinarily have the sole discretion
       to determine whom to charge with public offenses and what charges to bring.  This
24     prosecutorial discretion to choose, for each particular case, the actual charges from among
       those potentially available arises from the complex considerations necessary for the
25     effective and efficient administration of law enforcement. The prosecution's authority in
       this regard is founded, among other things, on the principle of separation of powers, and
26     generally is not subject to supervision by the judicial branch.... [¶]  [T]he separation of
       powers doctrine prohibits the legislative branch from granting prosecutors the authority,
27     after charges have been filed, to control the legislatively specified sentencing choices
       available to a court. A statute conferring upon prosecutors the discretion to make certain

28

decisions *before* the filing of charges, on the other hand, is not invalid simply because the prosecutor's exercise of such charging discretion necessarily affects the dispositional options available to the court. Rather, such a result generally is merely incidental to the exercise of the executive function—the traditional power of the prosecutor to charge crimes." (*Id.* at pp. 552 -553, citations and internal quotes omitted.)

Similarly, in this context, there is nothing unconstitutional in the Legislature's choice of reposing in the prosecutor the decision whether to charge a defendant under one subdivision or another of section 667.61. Here, the decision was made to charge defendant under the most severe provisions of section 667.61 rather than the least severe. Once that decision was made, and it was sealed by the jury's verdict, the judge was powerless to change it. "The law expressly divests trial courts of authority to avoid these severe sentences: it provides that courts are barred from exercising their traditional discretion to 'strike' any of the triggering circumstances specified in the One Strike law. (*Id.,* subd. (f).)" (*People v. Hammer* (2003) 30 Cal.4th 756, 761.)

Nor is the legislative classification irrational. The obvious purpose of the One Strike law is to impose the most severe sentences available on those sex offenders who, it has been pleaded and proved, committed their crimes under the most aggravated of circumstances. To that end, section 667.61, subdivision (e)(1) expressly provides that its kidnapping provisions apply *except when subdivision (d)* applies. And subdivision (f) provides: "If only the minimum number of circumstances specified in subdivision (d) or (e) which are required for the punishment provided in subdivision (a) or (b) to apply have been pled and proved, that circumstance or those circumstances shall be used as the basis for imposing the term provided in subdivision (a) or (b), rather than being used to impose the punishment authorized under any other provision of law, unless another law provides for a greater penalty. However, if any additional circumstance or circumstances specified in subdivision (d) or (e) have been pled and proved, the minimum number of circumstances shall be used as the basis for imposing the term provided in subdivision (a), and any other additional circumstance or circumstances shall be used to impose any punishment or enhancement authorized under any other provision of law. Notwithstanding any other law, the court shall not strike any of the circumstances specified in subdivision (d) or (e)." (§ 667.61, subd. (f), italics added.) In short, section 667.61 is designed to impose the greatest punishment possible, given the charging options available to the prosecutor, and the findings made by the trier of fact. In our view, there is nothing irrational about this statutory scheme, and the statutory scheme does not deprive defendant of equal protection or due process.

Exh. G at 57-59, original italics.

**B.    The State Court's Rejection Of Petitioner's Claim Was Reasonable**

Petitioner contends his sentences violated equal protection because he could have received 15-year-to-life sentences based on the jury's verdicts, rather than 25-year-to-life sentences. However, as the state court explained, the statutory scheme provided that if the requirements of imposition of the longer sentence were met under section 667.61(d), as they were here, that sentence was mandatory. Since subdivision (d) applied to "the most aggravated of circumstances," Exh. G at 59, as opposed to the less aggravated circumstances listed in subdivision (e), the legislative

1  determination that the longer sentence should be imposed did not violate equal protection.

2      Here, petitioner was not treated differently than any other defendant in the same situation,

3  nor does he so argue.  Rather, based on his offenses, he contends he could have been subject to

4  different punishment, and that the determination to impose the greater punishment was arbitrary and

5  unfair.  Under the statutory scheme, however, the greater punishment was mandated.  Petitioner

6  presents no argument that the legislative determination to treat more aggravated offenses more

7  harshly than less aggravated offenses was arbitrary or violated equal protection.  He contends only

8  that he should have received the lesser punishment.  Since that determination was first one of

9  prosecutorial charging discretion, and second a matter of state law, his contention is without merit.

10  Accordingly, his claim should be rejected.

11                                **CONCLUSION**

12      For the reasons stated, respondent respectfully requests that the petition for writ of habeas

13  corpus be denied.

14      Dated:  May 6, 2008

15                      Respectfully submitted,

16                      EDMUND G. BROWN JR.
                        Attorney General of the State of California

17                      DANE R. GILLETTE
                        Chief Assistant Attorney General

18
                        GERALD A. ENGLER
19                      Senior Assistant Attorney General

                        PEGGY S. RUFFRA
20                      Supervising Deputy Attorney General

21

22                      /s/ Joan Killeen
                        JOAN KILLEEN
23                      Deputy Attorney General

                        Attorneys for Respondent
24

25

26

27

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4329
JSW (PR)

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE CASE .............................................................................. 2

STATEMENT OF FACTS .................................................................................. 3

    Competency Trial ......................................................................................... 3

        Defense Case ............................................................................................. 3

        Prosecution's Case .................................................................................... 4

    Guilt Trial .................................................................................................... 6

        Prosecution's Case .................................................................................... 6

        Defense Case ............................................................................................. 12

        Prosecution's Rebuttal .............................................................................. 18

    Sanity Phase ................................................................................................ 20

STANDARD FOR GRANTING RELIEF ........................................................... 22

ARGUMENT ....................................................................................................... 22

**I.   THE TRIAL COURT'S ERROR IN DEFINING COMPETENCY AND RESPONDING TO THE JURY'S QUESTION DURING THE COMPETENCY TRIAL WAS HARMLESS** ....................................... 22

    A.   State Court Of Appeal's Ruling ............................................................. 23

    B.   The State Court's Rejection Of Petitioner's Claim Was Reasonable ...... 25

**II.   THE STATE COURT REASONABLY REJECTED PETITIONER'S CLAIM THAT HIS STATEMENTS TO THE POLICE WERE TAKEN IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS** ....................................................... 27

    A.   State Court Record ................................................................................. 28

    B.   State Court Of Appeal's Ruling ............................................................. 31

    C.   The State Court Reasonably Rejected Petitioner's Claim ...................... 33

**III.   THE STATE COURT REASONABLY REJECTED PETITIONER'S CLAIM THAT THE PROSECUTOR COMMITTED MISCONDUCT** ......................................................... 36

    A.   State Court Of Appeal's Ruling ............................................................. 36

    B.   The State Court's Rejection Of Petitioner's Claim Was Reasonable ...... 38

**TABLE OF CONTENTS** (continued)

Page

IV.    THE STATE COURT REASONABLY REJECTED
PETITIONER'S CLAIM THAT THE TRIAL COURT SHOULD
HAVE INSTRUCTED THE PROSECUTION BORE THE
BURDEN TO PROVE ABSENCE OF DURESS BEYOND A
REASONABLE DOUBT    40

V.    THE STATE COURT REASONABLY REJECTED
PETITIONER'S CLAIM THAT THE TRIAL COURT ERRED IN
INSTRUCTING ON IDIOCY    42

    A.    State Court Record    42

    B.    The State Court Of Appeal Reasonably Rejected Petitioner's Claim    44

VI.    THE STATE COURT REASONABLY REJECTED
PETITIONER'S CLAIM OF CUMULATIVE ERROR    46

VII.    THE STATE COURT REASONABLY REJECTED
PETITIONER'S CLAIM THAT THE TRIAL COURT ERRED IN
INSTRUCTING ON INSANITY    46

VIII.    THE STATE COURT REASONABLY REJECTED
PETITIONER'S CLAIM THAT THE TRIAL COURT ERRED
BY APPLYING THE AGGRAVATED KIDNAPPING
ENHANCEMENT TO THREE OFFENSES    47

    A.    State Court Of Appeal Opinion    48

    B.    The State Court Reasonably Rejected Petitioner's Claim    49

IX.    THE STATE COURT REASONABLY REJECTED
PETITIONER'S CLAIM THAT HIS SENTENCES VIOLATED
EQUAL PROTECTION    51

    A.    State Court Of Appeal's Ruling    52

    B.    The State Court's Rejection Of Petitioner's Claim Was Reasonable    53

CONCLUSION    54

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**Cases**

4

*Amaya-Ruiz v. Stewart*
121 F.3d 486 (9th Cir. 1997)                                    33-35

5

*Atkins v. Virginia*
6   536 U.S. 304 (2003)                                           27

7   *Beaty v. Stewart*
303 F.3d 975 (9th Cir. 2002)                                   49

8
*Benson v. Terhune*
9   304 F.3d 874 (9th Cir. 2002)                                   27

10  *Blackburn v. United States*
361 U.S. 199 (1960)                                            33

11
*Bonin v. Calderon*
12  59 F.3d 815 (9th Cir. 1995)                                    38, 39

13  *Bowen v. Roe*
188 F.3d 1157 (9th Cir. 1999)                                   2

14
*Boyde v. California*
15  494 U.S. 370 (1990)                                            44

16  *Brecht v. Abrahamson*
507 U.S. 619 (1993)                                   22, 26, 27, 41

17
*Brown v. Ohio*
18  432 U.S. 161 (1977)                                            50

19  *Brown v. Payton*
544 U.S. 133 (2005)                                            39

20
*Cacoperdo v. Demosthenes*
21  37 F.3d 504 (9th Cir. 1994)                                    49

22  *Calderon v. Coleman*
525 U.S. 141 (1998)                                            26

23
*Clemons v. Mississippi*
24  494 U.S. 738 (1990)                                            50

25  *Colorado v. Connelly*
479 U.S. 157 (1986)                                            33

26
*Cupp v. Naughten*
27  414 U.S. 141 (1973)                                            44

28

**TABLE OF AUTHORITIES  (continued)**

Page

*Darden v. Wainwright*
477 U.S. 168 (1986)                                                                     39

*Davis v. Woodford*
384 F.3d 628 (9th Cir. 2004)                                                            38

*Dixon v. United States*
548 U.S. 1 (2006)                                                                       41

*Donnelly v. DeChristoforo*
416 U.S. 637 (1974)                                                                     39

*Drope v. Missouri*
420 U.S. 162 (1975)                                                                     25

*Estelle v. McGuire*
502 U.S. 62 (1991)                                              41, 42, 44, 45, 47, 49

*Fry v. Pliler*
___ U.S. ___
127 S.Ct. 2321 (2007)                                                          22, 26, 35

*Godinez v. Moran*
509 U.S. 389 (1993)                                                                     25

*Hudson v. United States*
522 U.S. 93 (1997)                                                                      50

*Hutto v. Ross*
429 U.S. 28 (1976)                                                                      34

*James v. Borg*
24 F.3d 20 (9th Cir. 1994)                                                              39

*Juan H. v. Allen*
408 F.3d 1262 (9th Cir. 2005)                                                        33-35

*Lyles v. United States*
254 F.2d 725 (D.C. Cir. 1957)
*overruled in part by United States v. Brawner*
471 F.2d 969 (D.C. Cir. 1972)                                                           39

*Middleton v. McNeil*
541 U.S. 433 (2004)                                                                     44

*Miller-El v. Cockrell*
537 U.S. 322 (2003)                                                                     22

*Miranda v. Arizona*
384 U.S. 436 (1966)                                                                     27

**TABLE OF AUTHORITIES  (continued)**

**Page**

1

2
*Missouri v. Hunter*
3      459 U.S. 359 (1983)                                                      50

4      *North Carolina v. Butler* 441 U.S. 369 (1979)                          33

5      *Ortiz-Sandoval v. Gomez*
       81 F.3d 891 (9th Cir. 1996)                                             39

6
       *Pate v. Robinson*
7      383 U.S. 375 (1966)                                                     25

8      *People v. Hammer*
       30 Cal.4th 756 (2003)                                                50, 52

9
       *People v. Heath*
10     207 Cal.App.3d 892 (1989)                                               42

11     *People v. Jones*
       25 Cal.4th 98 (2001)                                                    51

12
       *People v. Murphy*
13     65 Cal.App.4th 35 (1998)                                                51

14     *Rich v. Calderon*
       187 F.3d 1064 (9th Cir. 1999)                                           38

15
       *Richardson v. Marsh*
16     481 U.S. 200 (1987)                                                     39

17     *Richmond v. Lewis*
       506 U.S. 40 (1992)                                                      50

18
       *Thompson v. Borg*
19     74 F.3d 1571 (9th Cir. 1996)                                            39

20     *United States v. Bautista-Avila*
       6 F.3d 1360 (9th Cir. 1993)                                           33, 34

21
       *United States v. Guerrero*
22     847 F.2d 1363 (9th Cir. 1988)                                           34

23     *United States v. Leggett*
       162 F.3d 237 (3d Cir. 1998)                                             27

24
       *United States v. Timbana*
25     222 F.3d 688 (9th Cir. 2000)                                            27

26     *Williams v. Borg*
       139 F.3d 737 (9th Cir. 1998)                                            50

27

28

## TABLE OF AUTHORITIES  (continued)

Page

*Williams v. Taylor*
529 U.S. 362 (2000)                                                    22

*Woodford v. Visciotti*
537 U.S. 19 (2002)                                                     22


**Statutes**

28 United States Code
     § 2244(d)(1)                                                    2
     § 2254(d)(1)                                                   22
     § 2254(d)(2)                                                   22

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)          22

California Penal Code
     § 207(a)                                                       2
     § 208(b)                                                       2
     § 245(a)(1)                                                    2
     § 273a(a)                                                      2
     § 288(b)(1)                                                    2
     § 289(a)(1)                                                    2
     §§ 459-460(a)                                                  2
     § 654                                                      47, 50
     § 667.6(d)                                                    51
     § 667.61                                                   48, 50
     § 667.61(a)                                                   48
     § 667.61(a), (b), (d), (e)                                     2
     § 667.61(a)-(e)                                                2
     § 667.61(c)                                                   48
     § 667.61(d)                                                52, 53
     § 667.61(d)(2)                                             48, 51
     § 667.61(e)                                                   52
     § 667.61(e)(4)                                                51
     § 667.61(e)(6)                                                51
     § 667.61(i)                                                   51
     § 12022(b)(1)                                                  2
     § 12022.3(a)                                                   2

**TABLE OF AUTHORITIES  (continued)**

**Page**

**Other Authorities**

California Jury Instructions, Criminal
     No. 4.00                                          46, 47
     No. 4.40                                          40
     No. 4.47                                      42, 44-47

Judicial Council of California, Criminal
     No. 3402                                       40
     No. 3450                                       46
     No. 3455                                      42, 44

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28